In re Steven Marc WEINBERG
and Dana Gretty Weinberg,
Debtors.

Richard E. Oney and Erin K.
Cox Oney, Appellants,

v.

Steven Marc Weinberg and Dana
Gretty Weinberg, Appellees.

BAP No. AZ–08–1281–PaDMo.
Bankruptcy No. 02–14058–RTB.
Adversary No. 02–01391–RTB.

United States Bankruptcy Appellate Panel,
for the Ninth Circuit.

Argued and Submitted June 19, 2009.

Filed July 31, 2009.

Richard Oney, Tiffany & Bosco, P.A., Phoenix, AZ, for Richard Oney, Erin Cox Oney.

Michael W. Carmel, Phoenix, AZ, for Steven and Dana Weinberg.

Before: PAPPAS, DUNN and MONTALI, Bankruptcy Judges.

## OPINION

PAPPAS, Bankruptcy Judge:

Appellants Richard E. Oney ("Oney") and his spouse, Erin K. Cox Oney, commenced an adversary proceeding against chapter 7 [1] debtors Steven Marc Weinberg ("Weinberg") [2] and spouse Dana Gretty Weinberg seeking a determination that their claim against Weinberg was excepted from discharge under § 523(a)(2)(A), (4) and (6). The bankruptcy court ruled in favor of Oney under § 523(a)(4) and in favor of Weinberg under § 523(a)(2) and (6). Oney appealed, challenging the amount the bankruptcy court determined was nondischargeable under § 523(a)(4) and the bankruptcy court's rejection of the § 523(a)(2)(A) and (6) claims. We AFFIRM.

## FACTS

Weinberg, an attorney, founded an intellectual property law firm known as the Weinberg Law Group P.C. ("WLG") in early 1999. Weinberg was the firm's president and a director from its inception to its closure on December 17, 2001. He was also the sole shareholder until late 2000 or early 2001 when John Cummerford ("Cum-

---

1. Unless otherwise indicated, all chapter, section and rule references are to the Bankruptcy Code, 11 U.S.C. §§ 101–1330, as enacted and promulgated prior to the effective date (October 17, 2005) of the relevant provisions of the Bankruptcy Abuse Prevention and Consumer Protection Act of 2005, Pub.L. 109–8, April 20, 2005, 119 Stat. 23, and to the Federal Rules of Bankruptcy Procedure, Rules 1001–9037.

2. Although the spouses of Oney and Weinberg are parties to the litigation and this appeal, they are not active participants, nor, except as indicated below, were they involved in the events giving rise to this contest. For convenience, we refer to the parties, collectively, as Oney and Weinberg.

merford") joined the firm.[3] At some point in 2001, Cummerford became the manager of the firm, although he appears only to have held the corporate titles of vice president and secretary.

Oney is also an attorney. He practiced intellectual property and patent law for several years as a solo practitioner. He was then employed by WLG from April 1, 1999, through August 31, 2000. The terms of his employment were that he would receive a percentage of WLG's collected receivables attributable to his work, less a share of the expenses incurred by WLG. Oney was to receive $10,000 per month as a draw from WLG, with the difference between his net collections and draws to be calculated quarterly. If this difference favored Oney, he was to be paid that amount by WLG. If the draws had overpaid Oney, he was to reimburse WLG for the difference.

By August 2000, Oney alleges that he had not been paid the amounts owed him by WLG for the previous two quarters. Following discussions between Weinberg and Oney about this situation, Weinberg terminated Oney's employment in an email sent to him on September 11, 2000, retroactive to September 1, 2000. On September 12, 2000, WLG paid Oney $73,962.28, which it alleged represented the amount of his actual undisputed unpaid wages. However, in a letter to WLG dated September 13, 2000, Oney took the position that WLG owed him $378,624.44, which included treble damages for unpaid wages pursuant to Ariz.Rev.Stat. ("A.R.S.") § 23–355.

That same day, Oney filed a complaint in Superior Court, Maricopa County, *Oney v. Weinberg Legal Group, PC*, no. CV2000–016938 (the "State Court Action"). WLG was the only defendant named in the complaint. Oney alleged that WLG had breached its employment contract with him, and Oney sought treble damages, interest, costs and fees. The complaint made no reference to any tort claims. WLG answered on January 30, 2001, disputing the amounts Oney alleged to be due, noting that it had paid Oney the undisputed portion of his unpaid wages, and asserting twelve affirmative defenses.

Between October 4, 2000, and August 27, 2001, WLG paid Oney an additional $69,695.22 in nine payments as accounts receivable were collected by the firm.

In approximately November 2001, Weinberg and Cummerford decided to close WLG; they joined another law firm as partners on December 18, 2001. Weinberg continued after that date to wind up the affairs of WLG. Mrs. Weinberg was paid a small salary for her services in helping wind up the firm.

On May 15, 2002, Oney moved for summary judgment in the State Court Action. After briefing and argument, the state court granted Oney a partial summary judgment. It found that Oney was an employee of WLG within the meaning of the Arizona Wage Act, A.R.S. § 23–355.[4] It further found that the money owed by WLG to Oney constituted wages as defined by the Arizona Wage Act, and that the payment from WLG to Oney on September 12, 2000, of $73,962.13, was untime-

---

**3.** At that time, the firm name was changed to Weinberg Cummerford Legal Group. Both the bankruptcy court and the parties referred to the firm by its original name, and so do we.

**4.** "Action by employee to recover wages; amount of recovery: A. Except as provided in subsection B of this section [not relevant

here], if an employer, in violation of this chapter, fails to pay wages due any employee, the employee may recover in a civil action against an employer or former employer an amount that is treble the amount of the unpaid wages." A.R.S. § 23–355(A).

ly. However, the state court determined that questions concerning WLG's good faith, and Oney's claim for treble damages, should be decided by a jury.

Weinberg and Cummerford acted as counsel to WLG in the State Court Action. Oney moved to disqualify them as counsel because they were to be trial witnesses. Oney's motion was unopposed, and the state court disqualified Weinberg and Cummerford effective July 17, 2002. Thereafter, WLG was not represented by counsel.

On August 9, 2002, Oney moved for reconsideration of the state court's partial summary judgment ruling referring the questions of good faith and treble damages to a jury. Since WLG was no longer represented by counsel, the motion was unopposed, and was granted by the state court on September 11, 2002. When WLG was also unrepresented at a pretrial conference held on September 23, 2002, the state court struck WLG's answer to the complaint, vacated the jury trial order, and set a default hearing for October 8, 2002. WLG did not appear at the default hearing.

On December 4, 2002, the state court entered a judgment against WLG in favor of Oney. In addition to the earlier finding in the partial summary judgment that WLG had violated the Arizona Wage Act, the state court concluded that WLG did not have a good faith defense to its failure to pay the wages and determined that Oney was entitled to treble damages on the undisputed amount of $73,962.28 and the disputed amount of $24,579.20, less a setoff for the paid $73,962.28. Thus, the state court awarded Oney $221,662.00 plus interest at 10 percent from September 6, 2000. The state court also awarded Oney $64,682.50 in attorney's fees and costs of $252.00 plus interest at 10 percent.

The Weinbergs filed a petition under chapter 7 of the Bankruptcy Code on September 4, 2002. On their Schedule F they listed a contingent, unliquidated, disputed debt owed to Oney valued at "$0.00" for "potential claim pertaining to Weinberg Cummerford."

Oney commenced an adversary proceeding against Weinberg on December 17, 2002; he filed an amended complaint on August 29, 2003. Oney's amended complaint sought an order from the bankruptcy court determining that he held a claim against Weinberg that was excepted from discharge under § 523(a)(2)(A), (4) and (6), and denying Weinberg's discharge pursuant to § 727(a)(2), (a)(4)(A), and (a)(5). Weinberg answered the amended complaint on September 30, 2003, generally denying the allegations in the complaint.

On June 10, 2005, both parties moved for summary judgment. Weinberg argued for dismissal of both the § 523 claims and the § 727 claims. After a hearing on October 6, 2005, the bankruptcy court dismissed the § 727 claims, concluding that there were no issues of material fact and that Weinberg was entitled to judgment as a matter of law. However, the bankruptcy court denied Weinberg's motion to dismiss and Oney's motion for summary judgment concerning the § 523 claims, and ordered that those claims proceed to trial.

On December 12, 2005, Weinberg moved to bifurcate the trial, requesting that the initial phase focus solely upon Oney's allegations that, at critical times, WLG was insolvent. Over Oney's limited objection, on January 4, 2006, the bankruptcy court granted Weinberg's motion.

The first phase of the trial took place on February 22, 2006. The bankruptcy court heard testimony from Weinberg and Susannah Sabnekar ("Sabnekar"), an accountant appearing as an expert witness for Oney. After receiving post-hearing

briefs, and hearing the parties' arguments on March 30, 2006, the bankruptcy court issued its decision concerning WLG's insolvency. Based upon its review of the evidence and testimony, the bankruptcy court determined that WLG was insolvent under the so-called balance sheet test as of November 1, 2001, and that it was never insolvent under the cash flow analysis test. While Sabnekar had testified that WLG was insolvent after September 6, 2000, under the balance sheet test, the bankruptcy court declined to credit this opinion for two reasons.

First, the bankruptcy court disagreed with Sabnekar's analysis that WLG's assets should not include any value for either WLG's work in progress ("WIP") or its accounts receivable ("AR"). The bankruptcy court reasoned that law firms generate income by generating WIP, billing their clients for the WIP, and then collecting the resulting AR. According to the bankruptcy court, "it defies logic to conclude that here no WIP or AR existed."

The bankruptcy court also took exception to Sabnekar's decision, in her insolvency analysis, to include a lease liability of $165,000 for WLG's office space without also accounting for an equivalent asset, the lease, even though Sabnekar was aware that the lease was paid and current through November 1, 2001.

The bankruptcy court remarked that, "because the opinions and conclusions of Sabnekar were not credible, it was extremely difficult and time consuming to sift through the evidence to determine the financial status (solvency or insolvency) of WLG." In performing its own insolvency analysis, the bankruptcy court adjusted Sabnekar's accounting matrix by including assets for WIP and AR, and by deleting the lease liability. Based on these calculations, the court determined that WLG's liabilities exceeded its assets by no later

than December 2001, and that WLG became and remained insolvent on a balance sheet basis from and after November 1, 2001.

Under the cash flow or equitable insolvency test, the bankruptcy court found no evidence that WLG was unable to pay its debts as they became due, and thus it found that WLG was not insolvent at any time under that test. Indeed, Weinberg had testified that WLG's bills had always been paid when due in the ordinary course of its business.

On April 24, 2006, Oney moved for reconsideration of the bankruptcy court's ruling that WLG was insolvent from and after November 1, 2001, arguing that the court had double-counted WIP and AR, that certain additional liabilities should be added to the insolvency analysis, and that the lease should be kept solely in the liability column. After a hearing, the bankruptcy court denied Oney's motion.

The second phase of the trial addressing Oney's discharge exception claims under § 523(a)(2)(A), (4) and (6) was conducted on May 31, June 7, and July 26, 2007. The bankruptcy court heard testimony from Cummerford, Sabnekar, Weinberg, Mrs. Weinberg, and Oney. After taking the issues under advisement, on July 26, 2007, the bankruptcy court entered its decision wherein it concluded, among other things that:

— After becoming insolvent on November 1, 2001, Weinberg received cumulative transfers from WLG totaling $43,484.98. In the court's view, these transfers violated the Arizona Trust Fund Doctrine because WLG paid the insider Weinberg in full, at a time when WLG was insolvent, therefore preferring Weinberg over WLG's other creditors, including Oney.

— At the time of the subject transfers, the total liabilities of WLG were

$472,141.74. The debt owed to Oney was $286,596.50, or 60.7 percent of total liabilities. Therefore, the bankruptcy court concluded, under the Trust Fund Doctrine, Oney should have received $26,395.38 of the $43,484.98 transferred to Weinberg. The court awarded Oney a nondischargeable claim against Weinberg under § 523(a)(4) in that amount.

— The bankruptcy court rejected Oney's arguments that his claim against Weinberg was excepted from discharge under § 523(a)(2)(A). Oney contended that Weinberg defrauded him in connection with events occurring in September 2000, because Weinberg never intended to provide him with office space and services after his termination. The bankruptcy court found that there was no evidence of any intent to deceive or defraud, and that Weinberg's behavior during that period was inconsistent with intent to deceive or defraud. Second, Oney argued that the payments from WLG to Weinberg were fraudulent transfers, and thus excepted from discharge under § 523(a)(2)(A). However, the bankruptcy court ruled that debts arising from transfers for less than reasonable value are not encompassed within § 523(a)(2)(A) because such transfers do not involve false pretenses, false representations or actual fraud on the creditor.

— As to Oney's argument for nondischargeability under § 523(a)(6), the bankruptcy court ruled that Oney's claim against Weinberg was for breach of his employment contract, and that such a claim was not the type of injury addressed in § 523(a)(6).

Based upon its various decisions, the bankruptcy court entered a judgment on October 14, 2008, awarding Oney $26,395.38, plus prejudgment interest at the rate of 10 percent from the date of its decision, August 28, 2007, to entry of judgment, and taxable costs and postjudgment interest consistent with provisions of 28 U.S.C. § 1961(a), and determining that these amounts were excepted from discharge in Weinberg's bankruptcy pursuant to § 523(a)(4). The bankruptcy court denied Oney's claims for nondischargeability under § 523(a)(2)(A) and (6), and for denial of discharge under § 727(a).

Oney timely appealed the bankruptcy court's judgment on October 24, 2008.[5]

## JURISDICTION

The bankruptcy court had jurisdiction under 28 U.S.C. §§ 1334 and 157(b)(2)(I). The Panel has jurisdiction under 28 U.S.C. § 158.

## ISSUES

Whether the bankruptcy court erred in deciding that WLG was insolvent on and after, but not before, November 1, 2001.

Whether the bankruptcy court erred in ruling that certain transfers from WLG to Weinberg made after November 1, 2001, did not violate the Arizona Trust Fund Doctrine.

Whether the bankruptcy court erred in denying Oney's claims for exceptions to discharge under § 523(a)(2)(A) and (6).

Whether the bankruptcy court abused its discretion in refusing to award Oney prejudgment interest from the dates of the particular transfers from WLG to Weinberg.

## STANDARDS OF REVIEW

■ The bankruptcy court's determinations regarding insolvency resolve ques-

---

5. Weinberg cross-appealed on October 30, 2008, but later voluntarily dismissed the appeal. Oney does not challenge the court's overruling of his objection to Weinberg's discharge.

tions of fact which are reviewed for clear error. *Flegel v. Burt & Assocs., P.C. (In re Kallmeyer)*, 242 B.R. 492, 495 (9th Cir. BAP 1999).

■ In bankruptcy discharge appeals, the Panel reviews the bankruptcy court's findings of fact for clear error and conclusions of law de novo, and applies de novo review to "mixed questions" of law and fact that require consideration of legal concepts and the exercise of judgment about the values that animate the legal principles. *Wolkowitz v. Beverly (In re Beverly)*, 374 B.R. 221, 230 (9th Cir. BAP 2007), *aff'd in part & dismissed in part*, 551 F.3d 1092 (9th Cir.2008), citing *Murray v. Bammer (In re Bammer)*, 131 F.3d 788, 791–92 (9th Cir.1997). Clear error exists when, on the entire evidence, the reviewing court is left with the definite and firm conviction that a mistake was made. *Hoopai v. Countrywide Home Loans, Inc. (In re Hoopai)*, 369 B.R. 506, 509 (9th Cir. BAP 2007).

■ The bankruptcy court's witness credibility findings are entitled to special deference, and are also reviewed for clear error. Rule 8013; *Anderson v. City of Bessemer City, N.C.*, 470 U.S. 564, 573, 105 S.Ct. 1504, 84 L.Ed.2d 518 (1985).

■ Awards of prejudgment interest are reviewed for abuse of discretion. *Champion Produce, Inc. v. Ruby Robinson Co.*, 342 F.3d 1016, 1020 (9th Cir.2003).

## DISCUSSION

### I.

*The bankruptcy court did not clearly err in determining that WLG was insolvent on and after, but not before, November 1, 2001.*

Section 523(a)(4) provides that "A discharge under section 727, 1141, 1228(a), 1228(b), or 1328(b) of this title does not discharge an individual debtor from any debt—. . . (4) for fraud or defalcation while acting in a fiduciary capacity, embezzlement, or larceny."

■ "Defalcation" is defined as the "misappropriation of trust funds or money held in any fiduciary capacity; the failure to properly account for such funds." *Lewis v. Scott (In re Lewis)*, 97 F.3d 1182, 1186 (9th Cir.1996) (quoting BLACK'S LAW DICTIONARY 417 (6th ed.1990)). A defalcation may include innocent, as well as intentional or negligent, defaults in performing trust duties. *Woodworking Enters., Inc. v. Baird (In re Baird)*, 114 B.R. 198, 204 (9th Cir. BAP 1990) (cited with approval in *In re Lewis*, 97 F.3d at 1186).

■ Under Ninth Circuit precedent, whether a relationship is a fiduciary one within the meaning of § 523(a)(4) is a question of federal law. *Ragsdale v. Haller*, 780 F.2d 794, 795 (9th Cir.1986). In the dischargeability context, the fiduciary relationship must arise from an express or technical trust that was imposed before and without reference to the wrongdoing that caused the debt. *Id.* at 796. Whether a fiduciary is a trustee chargeable under § 523(a)(4) is determined by reference to state law. *Id.*

■ The Panel has held that the Trust Fund Doctrine implicates an express trust sufficient for purposes of the application of § 523(a)(4). *Nahman v. Jacks (In re Jacks)*, 266 B.R. 728, 737 (9th Cir. BAP 2001); *In re Kallmeyer*, 242 B.R. at 495.

■ As a matter of disputed fact, the point in time at which WLG became insolvent is a critical issue in this appeal. A corporation's insolvency is a requisite for application of Arizona's version of the

Trust Fund Doctrine. In concluding that Weinberg had committed a defalcation as a fiduciary, giving rise to a nondischargeable claim under § 523(a)(4), the bankruptcy court applied the Arizona Trust Fund Doctrine.

The Trust Fund Doctrine is a time-honored principle in our legal system. It replaced the earlier common law rule that, upon dissolution of a corporation, its real estate reverted to the grantors and its personalty to the state. 19 AM. JUR.2d *Corporations* § 2419 (2008). The doctrine first appears in American case law in the early Nineteenth Century. *See Wood v. Dummer*, 30 F. Cas. 435, 437 (C.C.D.Me. 1824) (Story, Circ. Justice) (holding that the law will follow funds into the hands of any persons who are not innocent purchasers or have no equitable right to the property); *see also Decker v. Mitchell (In re JTS Corp.)*, 305 B.R. 529, 535 (Bankr. N.D.Cal.2003) (tracing the history of the Trust Fund Doctrine to Justice Story's opinion in *Wood*). The doctrine has been widely accepted and applied by state courts.[6]

The Trust Fund Doctrine was adopted as the law of Arizona in *Valley Bank v. Malcolm*, 23 Ariz. 395, 406, 204 P. 207, 211 (Ariz.1922) ("The doctrine that the assets of a private corporation constitute a trust fund for the benefit of its creditors, though often criticized or sought to be limited, is too firmly established by judicial decision

to be longer questioned."). The current manifestation of the Trust Fund Doctrine in Arizona case law is found in *A.R. Teeters & Assocs. v. Eastman Kodak Co.*, 172 Ariz. 324, 836 P.2d 1034 (Ariz.Ct.App. 1992), where the court explained:

> The theory of the trust fund doctrine is that all of the assets of a corporation, immediately on its becoming insolvent, exist for the benefit of all of its creditors and that thereafter no liens nor rights can be created either voluntarily or by operation of law whereby one creditor is given an advantage over others.

*Teeters*, 836 P.2d at 1041 (citation omitted).[7] According to *Teeters*, a director or officer of a corporation breaches a fiduciary duty owed to the company's creditors where:

> corporate assets were transferred to [the officer], the transfer of corporate assets occurred while the corporation was insolvent, and the transfer preferred [the officer] to the disadvantage of other creditors of the same priority. Liability, if established, is limited to the value of the assets received by the director, officer, or stockholder.

*Id.* As can be seen, then, the liability of a corporate officer to a creditor under the Arizona Trust Fund Doctrine arises when the corporation transfers assets to the officer while the company is insolvent.

---

**6.** *See, e.g., Theta Props. v. Ronci Realty Co.*, 814 A.2d 907, 917 (R.I.2003); *Jones v. Billings County School Dist. # 1*, 1997 N.D. 173, 176, 568 N.W.2d 477, 480 (N.D.1997); *In re Baldwin Trading Corp.*, 8 N.Y.2d 144, 148, 202 N.Y.S.2d 312, 168 N.E.2d 383, 384 (N.Y. 1960); *Franks v. Receiver of Booneville Banking Co.*, 202 Miss. 858, 867, 32 So.2d 859, 862 (Miss.1947); *Lind v. Johnson*, 183 Minn. 239, 242, 236 N.W. 317, 318 (Minn.1931); *Wilson v. Lucas*, 185 Ark. 183, 189, 47 S.W.2d 8, 10 (Ark.1932); *Nw. Roofers & Employers Health & Sec. Trust Fund v. Bullis*, 114 Idaho 56, 61,

753 P.2d 267, 272 (Idaho Ct.App.1988); *Blankenship v. Demmler Mfg. Co.*, 89 Ill. App.3d 569, 572, 44 Ill.Dec. 787, 411 N.E.2d 1153, 1155 (Ill.Ct.App.1980); *Saracco Tank & Welding Co. v. Platz*, 65 Cal.App.2d 306, 315, 150 P.2d 918, 923 (Cal.Ct.App.1944).

**7.** The holdings in the *Teeters* case and the Arizona Trust Fund Doctrine were recently reaffirmed in *Dawson v. Withycombe*, 216 Ariz. 84, 108, 163 P.3d 1034, 1058 (Ariz.Ct. App.2007).

■ The meaning of "insolvent" can vary. In this case, Oney and Weinberg disagree whether Arizona Trust Fund Doctrine compels application of the equitable insolvency cash flow standard, or the balance sheet standard, for determining insolvency. In *Teeters*, the Arizona court cited to A.R.S. § 10–002(12) (now § 10–140(29)) for the definition of insolvency: "inability of a corporation to pay its debts as they become due in the usual course of its business," *i.e.*, the cash flow standard. However, in its decision, the *Teeters* court also seemed to approve the trial court's instruction given to the jury that a corporation is insolvent when it *either* ceases to pay its debts in the ordinary course of business, cannot pay its debts as they become due, or its liabilities are greater than its assets. *Teeters*, 836 P.2d at 1041. This last standard for insolvency is referred to as the balance sheet test. *Akers v. Koubourlis (In re Koubourlis)*, 869 F.2d 1319, 1321 (9th Cir.1989) ("This definition of insolvency is the traditional bankruptcy balance sheet test of insolvency: whether debts are greater than assets, at a fair evaluation, exclusive of exempted property.").[8]

In this appeal, Oney argues that *Teeters* allows use of the balance sheet test for determining insolvency under Arizona law; Weinberg contends that the statute is plain and that only the cash flow standard applies to determine insolvency.[9]

The Panel concludes that the bankruptcy court did not err in applying the balance sheet test for insolvency in this case. While not as clear as it could be, we believe the *Teeters* court embraced a flexible definition for insolvency in this context. While the statute the state court cited to define insolvency in that decision adopts a cash flow insolvency approach, the court affirmed a verdict where the jury had been instructed by the trial court that it could apply either the cash flow standard or the balance sheet approach. In the absence of any more definite statement by the Arizona courts, we decline to construe *Teeters* as compelling application of one insolvency definition to the exclusion of the other.

Moreover, although the Panel has not previously examined the insolvency test under Arizona's Trust Fund Doctrine, it has approved the use of the balance sheet test to determine insolvency in connection with the application of the Trust Fund

---

**8.** This definition also appears in Arizona's Uniform Fraudulent Transfer Act, A.R.S. § 44–1002(a) ("UFTA") ("A debtor is insolvent if the sum of the debtor's debts is greater than all of the debtor's assets at a fair valuation."). Arizona recognizes a cause of action for breach of the Trust Fund Doctrine using the definition of insolvency in A.R.S. § 10–140(29) and a separate cause of action for breach of UFTA, using the definition in A.R.S. § 44–1002(a). However, in addition to the *Teeters* court, at least one other Arizona appeals court appears to have conflated the two definitions. In *Warne Investments, Ltd. v. Higgins*, 219 Ariz. 186, 194, 195 P.3d 645, 654 (Ariz.Ct.App.2008), *rev. denied* 2008 Ariz. LEXIS 192 (Ariz., Sept. 23, 2008), the appeal included separate awards under both the UFTA and the Trust Fund Doctrine. Even though the corporation was paying its bills as they became due, the appeals court ruled that

the jury could reasonably conclude that the corporation was insolvent for purposes of the Trust Fund Doctrine cause of action based on a balance sheet analysis.

**9.** Because the bankruptcy court determined that, under the cash flow standard, WLG was never insolvent, Weinberg argues that the Arizona Trust Fund Doctrine does not apply to these facts, that Weinberg violated no fiduciary duty owed to creditor Oney, and thus, any transfers from WLG to Weinberg would not support an exception to discharge under § 523(a)(4)'s "defalcation by a fiduciary" provision. Of course, even if that were correct, because Weinberg abandoned his cross-appeal of the bankruptcy court's judgment, the best result Weinberg can achieve is affirmance of that judgment.

Doctrine in two other states with statutes very similar to Arizona. *See In re Kallmeyer*, 242 B.R. at 496 (applying Oregon law); *In re Jacks*, 266 B.R. at 736–37 (applying California law). We therefore do not believe the bankruptcy court erred in applying the balance sheet test to determine whether WLG was insolvent.

After settling on the balance sheet test for insolvency, the bankruptcy court next was required to consider the evidence, including the expert testimony and report, in valuing assets and liabilities to determine the fact and date of WLG's insolvency. *Wolkowitz v. Am. Research Corp. (In re DAK Indus., Inc.)*, 170 F.3d 1197, 1199–1200 (9th Cir.1999) (in a balance sheet insolvency analysis, valuing assets and liabilities are questions of fact reviewed for clear error); *accord Transamerica Ins. Co. v. Trout*, 145 Ariz. 355, 360, 701 P.2d 851, 856 (Ariz.Ct.App.1985) ("A finding of insolvency [under a balance sheet test] therefore depends on an actual analysis of assets and liabilities—a 'fact-and-figure balancing[.]' "). Oney contends the bankruptcy court clearly erred in selecting November 1, 2001, as the date of insolvency.

The bankruptcy court considered Sabnekar's expert report and trial testimony opining that WLG was insolvent under the balance sheet test on and after September 6, 2000. The court found Sabnekar's opinions to be unreliable. It was especially troubled by Sabnekar's decision to exclude WIP and AR as assets of WLG for balance sheet purposes:

> The balance sheet could not be adjusted for either accounts receivable or accounts payable as complete monthly reports were either not maintained in the normal course of business or not provided. We did test the accounts receivable reports that could be traced. For the five months for which beginning and ending accounts receivable and monthly

case receipts were available, (see Exhibit VIII), we found that more than $221,000 in receivables was written off. Given this fact, it would appear that inclusion of the net realizable value of the accounts receivable would not materially affect the results of our insolvency assessments.

(Sabnekar's Report at 9).

The bankruptcy court found Sabnekar's approach illogical. It considered it indisputable that law firms generate income by creating WIP, billing WIP to create AR, and collecting AR. Since it was uncontroverted that WLG reported over $2 million in gross revenue for the period covered by Sabnekar's report, the bankruptcy court discounted Sabnekar's conclusion that there were no WIP or AR assets to be included in the WLG balance sheet for the periods in question.

The bankruptcy court also disagreed with Sabnekar's decision to include WLG's lease liability of $165,000 on the balance sheet without entering any corresponding asset for the value of the lease. The court first observed that, generally, only capital leases are entered on a balance sheet, and they are always entered as both an asset and a liability. Second, the court noted that Sabnekar was aware that the lease was fully paid through December 2001. Thus the court found Sabnekar's opinion testimony was not credible because it assumed the lease was a WLG liability without also recognizing some value to the lease as an asset.

An additional deficiency in Sabnekar's testimony concerned the treatment of accounts payable in the balance sheet analysis. Based on what he perceived her testimony to be on this issue, Oney has argued that the court failed to include between $50,000 and $65,000 a month in accounts payable as liabilities. A fair view of the evidence before the court, however, indi-

cates that Oney, through Sabnekar, did not provide the court with reliable evidence on the amount of the accounts payable.

Sabnekar's expert report does not mention any specific amount of accounts payable. The only reference to payables occurs on page nine of Sabnekar's Report: "The balance sheet could not be adjusted for either accounts receivable or accounts payable as complete monthly reports were either not maintained in the normal course of business or not provided." Later, though, as part of her testimony, Oney submitted his Exhibit 19 prepared by Sabnekar, which estimated accounts payable of $50,000 per month for each month in 2000 and 2001.

ONEY: So the second column from the left says, "Estimated accounts payable." And those are your estimates?

SABNEKAR: That's correct.

ONEY: What did you base those estimates on?

SABNEKAR: I only had two accounts receivable reports provided by the company. Both of those reports exceeded $50,000. I just used 50,000 as a conservative estimate, as I don't have any better evidence.

ONEY: When you say "accounts receivable" reports, you mean—

SABNEKAR: I mean, forgive me, accounts payable. I'm sorry.

Trial Tr. 130:6–23 (February 22, 2006).

However, under cross-examination, Sabnekar twice admitted that her "estimates" were pure speculation.

CARMEL (atty for Weinberg): You did not conduct any analysis of accounts payable during the relevant time period.

SABNEKAR: I was unable to conduct an analysis during the relevant time frame.

CARMEL: In fact you stated that any opinion on accounts payable would be pure speculation as to their actual value. Isn't that correct?

SABNEKAR: That's correct, sir.

Trial Tr. 62:19–63: 1 (February 22, 2006).

CARMEL: The accounts payable item, it was just a pure guess; is that correct?

SABNEKAR: Absolutely.

CARMEL: You had no evidence that on a month-to-month basis the firm had $50,000 in accounts payable from September 2000 through the end of December [2001].

SABNEKAR: No, sir.

. . .

CARMEL: And you did not conduct any independent analysis on accounts payable.

SABNEKAR: I could not, sir.

CARMEL: And just to tie this loose end, you do not know for a fact that every month there was $50,000 in accounts payable.

SABNEKAR: No, sir.

Trial Tr. 113:16–114:6 (February 22, 2006).

The only evidence presented to the bankruptcy court regarding the accounts payable was this testimony from Sabnekar. The bankruptcy court did not err in failing to consider evidence that the expert witness herself admitted was not based on analysis and was "pure speculation" and a "pure guess."

 We cannot say that the bankruptcy court clearly erred in severely discounting Sabnekar's opinions. A trial court has very broad discretion whether to discredit expert opinion if it is not reliable or does not aid the fact finder in its task. *See, e.g., Kumho Tire Co. v. Carmichael,* 526 U.S. 137, 152, 119 S.Ct. 1167, 143 L.Ed.2d 238 (1999) ("[T]he trial judge must have considerable leeway in deciding in a particular case how to go about deter-

mining whether particular expert testimony is reliable."); *Mukhtar v. Cal. St. Univ.*, 299 F.3d 1053, 1063 (9th Cir.2002) (citing *Kumho Tire* for the trial court's "special obligation" to determine the relevance and reliability of an expert's testimony).

Oney conceded in his testimony at trial that, in connection with his § 523(a)(4) claim, he bore the burden of proof in establishing WLG's insolvency. *See Diamant v. Hansen (In re Curry & Sorensen, Inc.)*, 112 B.R. 324, 327 (9th Cir. BAP 1990) (the plaintiff has the burden of proof relative to insolvency and must prove it by a preponderance of the evidence). The bankruptcy court could conclude that, by providing a seriously flawed expert report and testimony as his principal evidence that WLG was insolvent on September 6, 2000, Oney failed to meet his burden of proof that September 6, 2000, was the insolvency date and that any transfers after that date should be considered preferences.

Having rejected Oney's suggested date of insolvency, the bankruptcy court examined WLG's financial status in a series of factual determinations for each month between September 2000 and December 2001. The court determined that, by adjusting the Sabnekar report for AR and WIP, and employing other evidence in the record from such sources as the Johnson Bank collateral report and WLG's tax returns, WLG became insolvent in November 2001. At that point, gross revenue had significantly declined, and there was evidence that the firm was winding down (*e.g.,* reimbursements received from their new firm for Weinberg's and Cummerford's expenses; sale of most of WLG's office equipment; the decline in monthly payroll from $32,000 in August 2001 to $10,900 at the end of October 2001).

■ The bankruptcy court did not clearly err in its analysis of the evidence and ruling that WLG first became insolvent in November 2001. A bankruptcy court is free to consider subsequent events, such as the collection rate for AR, in valuing and adjusting assets and determining liabilities for insolvency determinations. *Sierra Steel, Inc. v. Totten Tubes, Inc. (In re Sierra Steel, Inc.)*, 96 B.R. 275, 278 (9th Cir. BAP 1989). Here, the bankruptcy court determined that the evidence presented by Oney favoring insolvency in earlier months was flawed based principally on an expert report that the court did not find credible. We give special deference to credibility findings of a trial court. *Anderson*, 470 U.S. at 573, 105 S.Ct. 1504. The bankruptcy court's determination of the fact and date of insolvency, as questions of fact, are also entitled to deference. Rule 8013. Because there is substantial evidence in the record to support its finding, it was not clear error for the bankruptcy court to fix November 2001 as WLG's insolvency date.

■ The bankruptcy court also determined that at no point was WLG insolvent under the cash flow standard. That finding is also not clearly erroneous. Under the cash flow standard as applied in Arizona, insolvency means the "inability of a corporation to pay its debts as they become due in the usual course of its business." A.R.S. § 10–140; *see also* A.R.S. § 44–1002(B): "A debtor who is generally not paying his debts as they become due is presumed to be insolvent." The bankruptcy court correctly noted that Oney provided no evidence that WLG was either unable to pay its debts as they became due in the usual course of its business, or that it was generally not paying its debts as they became due. On the contrary, there was evidence in the record to support the court's conclusion that all WLG debts were

paid in the ordinary course of business, at least through November 2001. This was supported by the testimony of Weinberg which the court found credible. Additionally, the court observed that there were numerous possible sources which WLG could have tapped to pay Oney's debt, and thus Oney had not met his burden of proving that WLG was "unable" to pay Oney's debt when due. These findings are not clearly erroneous.

## II.

*The bankruptcy court did not clearly err in ruling that certain transfers from WLG to Weinberg after November 1, 2001, did not violate Arizona's Trust Fund Doctrine.*

 Having established WLG's date of insolvency as November 1, 2001, the bankruptcy court then considered whether transfers from WLG to Weinberg after that date violated the Arizona Trust Fund Doctrine, and thus constituted nondischargeable debts for fiduciary defalcation under § 523(a)(4).

The bankruptcy court found that Weinberg received certain transfers from WLG totaling $43,484.98 after November 1, 2001. We agree that these transfers violated Arizona's Trust Fund Doctrine because WLG paid Weinberg's debts in full via these payments, at a time when WLG was insolvent, and thereby preferred Weinberg over the other creditors of WLG. To reflect his proportionate share of the funds transferred, the bankruptcy court awarded Oney 60.7 percent of that $43,484.98, or $26,395.38, as a nondischargeable claim pursuant to § 523(a)(4).

Oney, however, contends that numerous, other post-November 1, 2001 payments give rise to nondischargeable debts. In his opening brief, Oney states that it is undisputed that approximately $400,000 was paid by WLG after November 1, 2001, to Weinberg and creditors other than Oney. Oney Opening Br. at 14. At another point in the opening brief, Oney alleges that Weinberg transferred over $300,000 in discretionary payments to its officers, shareholders and directors. Oney Opening Br. at 18. Regarding the $400,000 allegation, this is supported in the statement of agreed facts in the Pretrial Order, but we note that at least $230,000 of that sum were payments to Johnson Bank on the WLG line of credit, which we have no reason to believe should be imputed to Weinberg's benefit.[10] As to the $300,000 allegation, Oney cites only his own affidavit as proof, does not indicate that all these funds were allegedly paid after November 1, 2001, and provides no breakdown of the numbers.

Oney argues that the largest of these payments should be considered distributions to shareholders rather than wages or other business expenses. Oney does not clearly articulate in his briefs which payments he is referring to. However, the bankruptcy court found that "WLG records and the account statements do evidence that there were significant business expenses paid [to Weinberg] which were clearly legitimate WLG expenses."

---

10. Courts apply the Trust Fund Doctrine as a fiduciary rule, prohibiting transfer of assets to insiders of an insolvent corporation. It has not been applied to payments or transfers to non-insider creditors in the ordinary course of business. *See, e.g., Production Resources Group, L.L.C. v. NCT Group, Inc.,* 863 A.2d 772, 791–92 (Del.Ch.2004) (Interpreting the Trust Fund Doctrine, "the mere fact that directors of an insolvent firm favor certain creditors over others of similar priority does not constitute a breach of fiduciary duty, absent self-dealing."); *see also Sharp Int'l Corp. v. State St. Bank & Trust Co. (In re Sharp Int'l Corp.),* 403 F.3d 43, 54 (2d Cir.2005) (insolvent corporation may pay certain creditors and leave others unpaid, excluding insiders).

For example, Oney targeted WLG's payment of various credit card bills of Weinberg. The bankruptcy court found that Weinberg had used his credit card for WLG business purposes, and was then reimbursed by WLG for those expenses, and that the reimbursements were not "distributions." In making this finding, the court "carefully reviewed the various payments by WLG [to Weinberg] from and after November 1, 2001, and the account statements[.]" In other words, the bankruptcy court found, based upon the evidence, that the payments made after November 1, 2001, were for legitimate business expenses.

That Oney considers those payments were for nonbusiness purposes merely amounts to a second view of the evidence. Where there are two permissible views of the evidence, the trial court's choice between them cannot be clearly erroneous. *Anderson,* 470 U.S. at 574, 105 S.Ct. 1504. The bankruptcy court did not clearly err in ruling that the other post-November 1, 2001 transfers were not payments violating the Trust Fund Doctrine for which Oney should receive his proportionate share.[11]

### III.

*The bankruptcy court did not err in denying Oney's claims under § 523(a)(2)(A) and (6).*

Oney argues that his judgment also should be excepted from discharge under

§ 523(a)(2)(A) and (6). Oney's argument lacks merit.

■■■ Section 523(a)(2)(A) provides that, "A discharge under ... this title does not discharge an individual debtor from any debt—(2) for money, property, services, or an extension, renewal or refinancing of credit, to the extent obtained by— (A) false pretenses, a false representation, or actual fraud, other than a statement respecting the debtor's or an insider's financial condition." To prevail on a claim under § 523(a)(2)(A), a creditor must demonstrate five elements: "(1) misrepresentation, fraudulent omission or deceptive conduct by the debtor; (2) knowledge of the falsity or deceptiveness of his statement or conduct; (3) an intent to deceive; (4) justifiable reliance by the creditor on the debtor's statement or conduct; and (5) damage to the creditor proximately caused by its reliance on the debtor's statement or conduct." *Turtle Rock Meadows Homeowners Ass'n v. Slyman (In re Slyman),* 234 F.3d 1081, 1085 (9th Cir.2000) citing *Am. Express Travel Related Servs. Co. v. Hashemi (In re Hashemi),* 104 F.3d 1122, 1125 (9th Cir.1996). The creditor bears the burden of proof to establish all five of these elements by a preponderance of the evidence. *In re Slyman,* 234 F.3d at 1085.

■■■ Oney insists that Weinberg defrauded and deceived Oney in connection

---

**11.** At the conclusion of Oney's discussion of the post-November 1, 2001 payments, he observes that "even assuming that all of the monies received by the Weinbergs were for legitimate corporate debts to them and not distributions (which the Oneys dispute), their pro-rata portion of WLG's total debt (60.7 percent), using the court's formula, was only 9.2 percent.... Yet the court allowed the Weinbergs to retain $17,089.60 (or 39.3 percent of the $43,484.98) of the payments from WLG after November 1, 2001." Oney's Opening Br. at 17.

It is not clear what point Oney seeks to make by this statement. The bankruptcy court awarded Oney a portion of the payments from WLG to Weinberg. It took no action regarding the balance still in Weinberg's hands. To the extent that Oney suggests that the balance should be distributed to other creditors in proportion to their debt, Oney has no standing to make such an argument.

with the events of September 2000. He alleges that, at that time, Weinberg promised to pay him on a quarterly basis and failed to do so, and that during his last month with WLG, he would have access to office services, but did not.

There was no evidence at trial that Weinberg made any "false representations" to Oney, acted under "false pretenses" or committed other actual fraud. The critical inquiry under § 523(a)(2) is intent to defraud, not intent to pay. Still, the bankruptcy court found several factors militating against any finding of fraud. For example, WLG paid Oney over $72,000 on September 12, 2000, which was more than he had requested in his memorandum demanding payment of $69,000 in back pay. Weinberg's memorandum to Oney of September 11, 2000, had offered various options for a continuing association with WLG, or establishing of procedures for terminating the relationship. In addition, WLG faithfully paid Oney his share of accounts receivable as collected over a period of several months thereafter. We agree with the bankruptcy court that these circumstances weigh against the notion that Weinberg intended to defraud Oney for purposes of § 523(a)(2)(A).

 Section 523(a)(6) provides that, "A discharge under ... this title does not discharge an individual debtor from any debt—(6) for willful and malicious injury by the debtor to another entity or to the property of another entity."

As a preliminary matter, Oney's claim under § 523(a)(6) appears to be based on the assumption that Oney was an employee of Weinberg, and that his claim arises for breach of employment contract. However, Oney was never Weinberg's employee; he was employed by WLG. Oney relies heavily on *Petralia v. Jercich (In re Jercich)*, 238 F.3d 1202, 1209 (9th Cir.2001). *Jercich* dealt with a corporation wholly controlled by one individual who ruthlessly exploited the corporation's assets and staff. There did not appear to be any question that Jercich was the alter ego of the corporation. Oney has given us no authority or argument specifically for piercing the corporate veil in this case and assigning responsibility for WLG's alleged actions to Weinberg. But even if we were to consider for argument's sake that Weinberg was responsible for an alleged breach of Oney's employment contract, Oney's argument is without merit.

As the bankruptcy court held, Oney's dispute with Weinberg concerns a breach of contract action without an associated tort, and is not the kind of injury addressed in § 523(a)(6). *Lockerby v. Sierra*, 535 F.3d 1038, 1041 (9th Cir.2008) ("Something more than a knowing breach of contract is required before conduct comes within the ambit of § 523(a)(6), and *Jercich* defined that 'something more' as tortious conduct."); *Kawaauhau v. Geiger*, 523 U.S. 57, 61, 118 S.Ct. 974, 140 L.Ed.2d 90 (1998) (A "willful" injury is a "deliberate or intentional *injury*, not merely a deliberate or intentional *act* that leads to injury."); *Carrillo v. Su (In re Su)*, 290 F.3d 1140, 1146–47 (9th Cir.2002) (a willful and malicious injury under § 523(a)(6) involves "(1) a wrongful act, (2) done intentionally, (3) which necessarily causes injury, and (4) is done without just cause or excuse.") (quoting *In re Jercich*, 238 F.3d at 1209).

While a breach of contract, when accompanied by conduct constituting a tort, may support an exception to discharge under § 523(a)(6), Oney's heavy reliance on *Jercich*, the Ninth Circuit decision establishing this principle, is misplaced. Although both *Jercich* and this appeal involve claims for unpaid wages, there are many significant differences in the facts. Notably, *Jercich* involved an employer who not only failed to pay his employee, but used busi-

ness funds for personal investments, including a horse ranch, and who engaged in "despicable conduct that subjects a person to cruel and unjust hardship in conscious disregard of that person's rights." *In re Jercich*, 238 F.3d at 1209 (citation omitted). In contrast, Oney was paid more than he originally requested, and WLG faithfully continued to pay Oney his percentage of accounts receivable as collected. This hardly represents the type of despicable conduct *Jercich* condemns.

*Jercich* is not the only, or even most recent, case law in this circuit interpreting nondischargeability under § 523(a)(6). The court in *In re Su*, mentioned above, provided an extended discussion of the willfulness prong in § 523(a)(6). 290 F.3d at 1143–44. The test for willful injury in *In re Su* is a subjective one. The subjective standard correctly focuses on the debtor's state of mind and precludes application of § 523(a)(6)'s nondischargeability provision short of the debtor's actual knowledge that harm to the creditor was substantially certain. *Id.* Here, the court properly looked to the behavior of Weinberg in paying the disputed wages and continuing to pay Oney's share of the accounts receivable as evidence that there was no willful intent to cause injury.

The bankruptcy court did not err in denying that Oney's claims were nondischargeable under § 523(a)(2) and (6).

## IV.

*The bankruptcy court did not err in denying Oney prejudgment interest on his claim based upon the dates of the transfers.*

In its final judgment, the bankruptcy court awarded prejudgment interest to Oney. In doing so, it set the accrual of that interest from the date of its order fixing the amount owed by Weinberg to Oney on the nondischargeable claim, August 27, 2007. We believe, in this regard, that the bankruptcy court was correct.

▮▮▮ It is settled that where a debt that is found to be nondischargeable arose under state law, "the award of prejudgment interest on that debt is also governed by state law." *Otto v. Niles (In re Niles)*, 106 F.3d 1456, 1463 (9th Cir.1997). Oney's claim against Weinberg for violation of the Trust Fund Doctrine is governed by Arizona law. The Arizona Supreme Court has held that prejudgment interest on a liquidated claim is a matter of right. *Fleming v. Pima County*, 141 Ariz. 149, 155, 685 P.2d 1301, 1307 (Ariz.1984). "Prejudgment interest accrues from the date damages are liquidated 'as compensation for the detention of the money from the judgment creditor.'" *Pueblo Santa Fe Townhomes Owners' Ass'n v. Transcontinental Ins. Co.*, 218 Ariz. 13, 178 P.3d 485, 496 (Ariz.Ct.App.2008) (quoting *Ariz. E.R.R. Co. v. Head*, 26 Ariz. 259, 262, 224 P. 1057, 1059 (Ariz.1924)). However, if damages are not liquidated, "no interest is allowed upon the theory that the person liable does not know the sum he owes and therefore can be in no default for not paying." *Head*, 224 P. at 1059. Damages are liquidated if "the evidence of damages furnish[es] data which, if believed, makes it possible to compute the amount of damages with exactness, without relying upon opinion or discretion." *Banner Realty, Inc. v. Turek*, 113 Ariz. 62, 64–65, 546 P.2d 798, 800–01 (Ariz.1976); *Employer's Mut. Cas. Co. v. McKeon*, 170 Ariz. 75, 77, 821 P.2d 766, 769 (Ariz.Ct.App.1991) (same).

Oney relies on two cases for his argument that the bankruptcy court made precise findings of the transfers to Weinberg in 2001 and 2002, and thus Oney's claim was liquidated under Arizona law, with prejudgment interest payable from the dates of the transfers. *Gemstar Ltd. v.*

*Ernst & Young,* 185 Ariz. 493, 509, 917 P.2d 222, 237–38 (Ariz.1996); *Fleming v. Pima County,* 141 Ariz. 149, 155, 685 P.2d 1301, 1307 (Ariz.1984). However, both *Gemstar* and *Fleming* were contract disputes, and the precise amounts of the claims of the parties were never in dispute. *Fleming* was a wrongful discharge action, where the court awarded prejudgment interest on withheld paychecks. *Gemstar* was a dispute among investors where one investor diverted funds from commonly held property, and there was no dispute over the percentage of ownership of the property by each investor. In short, in both these cases, the claims met the liquidation test under Arizona law because each was "at all times susceptible to exact computation, no part of the amount was subject to *opinion or discretion,* [and] it could have been determined with precision." *Costanzo v. Stewart Title & Trust of Phoenix,* 23 Ariz.App. 313, 317, 533 P.2d 73, 77 (Ariz.Ct.App.1975) (emphasis added).

 Oney's argument is flawed because he equates the amount of the transfers (which could be determined with exactness before the bankruptcy court's judgment) with the amount of his claim. Oney has never argued that he was entitled to recover the full amount of the transfers. The bankruptcy court properly awarded Oney a percentage of those transfers, and determination of the proper percentage was an exercise of its "opinion and discretion," an aspect of the decision which defeats the liquidation test under Arizona law. In other words, Oney's nondischargeable claim could not be computed with exactness until the bankruptcy court fixed the amount owed by Weinberg to Oney on August 27, 2007, by making the calculations. Consequently, the bankruptcy court's decision to award prejudgment interest from that date, not the date of the subject transfers, is consistent with Arizona law.

## CONCLUSION

We AFFIRM the decision of the bankruptcy court establishing a nondischargeable claim in favor of Oney under § 523(a)(4) for Weinberg's violation of the Arizona Trust Fund Doctrine, its calculation of the amount of that claim, and its decision to award prejudgment interest only from the date of its order. We also AFFIRM the bankruptcy court's decision rejecting Oney's claims under § 523(a)(2)(A) and (6).