FILED

DEC 28 2011

SUSAN M SPRAUL, CLERK
U.S. BKCY. APP. PANEL
OF THE NINTH CIRCUIT

NOT FOR PUBLICATION

**UNITED STATES BANKRUPTCY APPELLATE PANEL**

**OF THE NINTH CIRCUIT**

| | |
|---|---|
| In re: | BAP Nos.   EC-11-1138-KiDJu |
| | EC-11-1150-KiDJu |
| DARYL J. ROGERS; MONICA E. ROGERS, | (related appeals) |
| | |
| | Adv. No.   09-02643 |
| Debtors. | |
| _____ | Bk. No.   09-34525 |
| | |
| HOWARD PATTERSON, | |
| | |
| Appellant, | |
| | |
| v. | **M E M O R A N D U M**[1] |
| | |
| DARYL J. ROGERS, | |
| | |
| Appellee. | |
| _____ | |

Argued and Submitted On November 16, 2011
at Sacramento, California

Filed - December 28, 2011

Appeal from the United States Bankruptcy Court
for the Eastern District of California

Honorable Philip H. Brandt, Bankruptcy Judge, Presiding

_____

Appearances:   Patricia Kramer of Neasham & Kramer LLP argued for
appellant, Howard Patterson; Larry J. Cox of the
Law Offices of Larry J. Cox argued for appellee,
Daryl J. Rogers.

_____

Before: KIRSCHER, DUNN, and JURY, Bankruptcy Judges.

---

[1] This disposition is not appropriate for publication. Although it may be cited for whatever persuasive value it may have (see Fed. R. App. P. 32.1), it has no precedential value. See 9th Cir. BAP Rule 8013-1.

Appellant, Howard Patterson ("Patterson"), filed a nondischargeability action against appellee, chapter 7[2] debtor Daryl J. Rogers ("Rogers"), seeking to except his debt from discharge under § 523(a)(2)(A). Patterson's fraud claim was based on two events in connection with a real estate deal between Patterson, Rogers, and Rogers's company, Gridiron Development, LLC. Patterson prevailed on his fraud action on what is referred to as the "2005 Release," but the bankruptcy court found no fraud existed as to the "2007 Release." In these related appeals, Patterson appeals the court's Third Amended Judgment with respect to the 2007 Release and the court's measure of damages, and he appeals the court's orders denying his second motion to alter/amend judgment and his motion for attorney's fees and costs. We AFFIRM in part and REVERSE in part.

## I. FACTUAL AND PROCEDURAL HISTORY

**A.   Prepetition Facts.**

**1.   Events leading to the 2005 Release.**

The following facts are undisputed. Rogers is a licensed real estate agent in California. As a Master Faculty Trainer, Rogers trains other real estate professionals in a broad range of subjects across the country through Keller Williams University. Patterson is a licensed general contractor with the state of California.

On or about May 6, 2005, Rogers entered into a written Vacant Land Purchase Agreement ("Purchase Agreement") with

---

[2] Unless otherwise indicated, all chapter, section and rule references are to the Bankruptcy Code, 11 U.S.C. §§ 101–1532, and to the Federal Rules of Bankruptcy Procedure, Rules 1001–9037.

Patterson for the sale of certain real property commonly known as Heritage Park Estates, located in Loomis, California ("Heritage Park"). Heritage Park was subject to an approved Tentative Subdivision Map for Phases II and III, which allowed for 40 individual lots to be created upon the approval and recordation of the Final Subdivision Map. The purchasers were Rogers and/or another entity, Eller Development, Inc. ("Eller Development"), which is located in Iowa and owned by Matt Eller ("Eller"), a long-time friend and business associate of Rogers.

On May 18, 2005, Rogers and Eller formed Gridiron Development, LLC ("Gridiron") for the sole purpose of developing Heritage Park. On or about June 15, 2005, Rogers and Patterson agreed to substitute Gridiron as "buyer" of Heritage Park. The purchase price for the property was $4.5 million, with Patterson financing a $1.5 million note at 8% interest. Patterson was also to be deeded back four of the Heritage Park lots once the Final Map was approved and recorded. UMPQUA Bank ("UMPQUA") also funded a first deed of trust loan for Heritage Park.

Keller Williams Auburn ("Keller Williams") represented Patterson in the sale. Keller Williams is the dba of Kay Dub U Auburn, LP., a California Limited Partnership in which Rogers has an ownership interest, and at the time of the sale had an employment relationship. Although Rogers is not a real estate broker, Wayne Hall, the broker for Keller Williams, designated Rogers to make virtually all of the decisions normally made by a broker for Keller Williams. Agent Ken Hendrickson facilitated the sale between Patterson and Rogers/Gridiron and received a commission of $90,635.

- 3 -

Rogers and Eller made an initial deposit of $1 million on Heritage Park. Rogers and Patterson then executed various addenda to the Purchase Agreement. Addendum 1, dated May 7, 2005, provided for Patterson's seller financed deed of trust loan. It was to be secured by Heritage Park "or other property agreeable by both buyer and seller." A second Addendum 1 [sic], dated May 19, 2005, referenced Patterson's seller financed deed of trust loan and stated that it was now to be secured by "seller's position of $500,000 . . . each in three separate buildings with lowest LTV of Ames Iowa development project." On May 27, 2005, Rogers and Eller, on behalf of Gridiron, executed a promissory note in favor of Patterson for $1.5 million, which reflected the maturity date as "payable upon completion of Heritage Park Estates Project in Loomis, California or as otherwise agreed by the parties."

Eller Development owned what is a known as Parcel "A" of Lot "2" of the Seventh Addition to Dauntless Subdivision, located in Ames, Iowa (Parcel "A"). This property became known as the West Towne Condominiums ("West Towne"). West Towne consisted of seven three-story mixed use condominiums built on Parcel "A" between 2005 and 2007. On or about June 27, 2005, Patterson accepted security for his note in the form of a real estate mortgage, executed by Eller Development, in his favor for $1.5 million on three of the seven buildings on Parcel "A" - Buildings "A", "B" and "E" ("First Mortgage"). Before Patterson agreed to accept security in West Towne, Rogers told Patterson that he personally owned one of the buildings and that one of the buildings securing Patterson's loan was "free and clear." The

- 4 -

First Mortgage was recorded in Iowa on June 27, 2005. Sometime on or before June 27, 2005, Addendum 5 to the Purchase Agreement reflected that the loan balance due Patterson was $1.1 million. Around that same time, a second [sic] Addendum 5 provided that: "Seller agrees to convey final 4 lots previously reserved for himself to buyer for sum of $400,000. Total sales now include all 40 lots on the recorded Final Map."

Meanwhile, on June 16, 2005, Eller Development took out a loan from First National Bank of the Midwest for $3.56 million on Building "E" (the "Midwest Mortgage"), one of the buildings securing Patterson's loan. The Midwest Mortgage was not recorded until July 18, 2005, after Patterson's First Mortgage had been recorded on June 27. Unbeknownst to Patterson, on July 19, 2005, the day after the Midwest Mortgage was recorded, Eller Development executed (but did not record) a Second Mortgage in favor of Patterson on the same three buildings located on Parcel "A" in the amount of $1.5 million.

Neither Rogers nor Eller told Patterson that Eller had recorded the Midwest Mortgage against Building "E" after recording Patterson's First Mortgage. Instead, Rogers asked Patterson to execute a release of the First Mortgage to correct a "property description" error. Neither Rogers nor Eller told Patterson that if he released his mortgage, his security interest in West Towne would be subordinated to the Midwest Mortgage on Building "E" when the Second Mortgage was recorded.

Patterson executed the release of the First Mortgage on Buildings "A", "B" and "E" on July 28, 2005 (the "2005 Release"), because he believed and relied upon what Rogers had told him -

that it was necessary to correct the property description.  Eller recorded the 2005 Release on August 8, 2005, and recorded the Second Mortgage the same day.  When the 2005 Release was recorded, the Midwest Mortgage moved into first position on Building "E".  As it turns out, no error existed in the property description requiring correction.  Moreover, Rogers knew it was not necessary to release a mortgage to correct a property description.  Patterson later learned that Rogers did not own a building in West Towne when he made that representation to Patterson in May 2005; Rogers did not purchase Building "D" until October 20, 2005.

Some payments, at least $300,000, were made on Patterson's loan.  Payments ceased, however, after June 2006.  Shortly thereafter, Patterson traveled to Iowa to inspect West Towne.  On September 26, 2006, Eller Development quitclaimed Buildings "A", "B" and "E" (which secured Patterson's loan) to Phinn LC, a company solely owned by Eller.  From November 2006 through May 2007, Patterson called Rogers frequently to inquire about payment on the loan.  On each call, Rogers assured Patterson that payment would be forthcoming and that Patterson should not be concerned.  Patterson agreed to Rogers's repeated requests to forebear from foreclosing on West Towne.

**2.  Events leading to the 2007 Release.**

The following facts are largely undisputed.  As of June 8, 2007, Eller Development owned Buildings "C", "F" and "G", Phinn LC owned Buildings "A", "B" and "E", and Rogers owned Building "D".  Although payments were not being made on the loans for West Towne, none of the Buildings were subject to judicial or non-

- 6 -

judicial foreclosure, and no notices of default had been recorded.

Between March and June 2007, Eller and Rogers actively marketed West Towne for sale and received several offers to purchase the property. Rogers did not tell Patterson that he and Eller intended to transact a short sale of Parcel "A" in June 2007 or at any other time. On May 26, 2007, Rogers and Eller received an offer for approximately $24 million for West Towne. Around this same time, Rogers told Patterson that West Towne was in "foreclosure" and that Patterson would lose everything unless he was willing to take alternate security for his loan. Just prior to this, on or about May 16, 2007, Rogers had proposed to Eller that if Patterson would release his security interest in West Towne, in exchange Gridiron would give Patterson a deed of trust on Heritage Park. However, the men were concerned about Gridiron investors losing their investment, so Rogers proposed giving Gridiron investors a second deed of trust to Heritage Park (behind UMPQUA and ahead of Patterson) in the amount of $1.1 million, which was just under the approximate $1.3 million of equity in the property. Below is an email exchange between Megan Tjernagel, an employee of Eller Development, and Rogers, dated May 16, 2007:

> MEGAN: Have you had any luck obtaining a release from Howard on the West Towne property?
>
> ROGERS: Once again, I need to talk with Matt. We never finish this conversation. If Howard releases, then what do we want to put it on as replacement? Right now he has a lien on West Towne and they aren't worth anything. I prefer that to my home or [Heritage Park]. If he puts it on [Heritage Park], then our investors are out of luck. There is too much equity in [Heritage Park] and he could foreclose and sell it cheap and get his money and we

- 7 -

would be out. So I proposed we find a way to have our 1 million of equity in [Heritage Park] put on a second deed of trust after the bank's. Then we could have Howard go on as 3rd place. I am not sure if that is what Matt wants to do. Any other suggestions??

Rogers executed a second deed of trust on behalf of Gridiron in favor of Gridiron to secure its investors for $1.1 million and sent it to Heidi Schwalbe of Alliance Title to record before Patterson's third deed of trust.

Based on Rogers's representation that West Towne was in foreclosure and worthless and that Patterson would fare better if he accepted a deed of trust on Heritage Park, Patterson ultimately agreed to release his Second Mortgage on West Towne (the "2007 Release"). In order to satisfy Patterson's concerns about signing the 2007 Release before he received the Heritage Park deed of trust, Rogers prepared and presented to Patterson an undated promissory note in the amount of $1.4 million (the amount now owed on the original loan), to be secured by a deed of trust on Heritage Park, Rogers's personal residence, and Rogers's stock in Keller Williams.

According to Patterson, Rogers told him that the 2007 Release had to be signed on June 8, 2007. Patterson appeared at Rogers's office on June 8, but Rogers was not there. An employee told Patterson that Rogers had been called to a family emergency. Other than the new unsigned note and the deed of trust to Heritage Park, no other documents were prepared for the security in Rogers's home or stock. While Patterson was at the office, he saw documents on the counter that indicated his interest in Heritage Park might be recorded in third position. Patterson proceeded to sign the 2007 Release.

Patterson went back to Rogers's office on the following Monday, June 11, 2007. He asked Rogers what was going on and demanded to know about the other security Rogers had promised him in his home and stock. Rogers replied that he never intended to give Patterson the additional security interest in either his home or his stock. Patterson objected to his third position on Heritage Park and demanded that Rogers not record the 2007 Release. Rogers told Patterson that it was "too late" because he had already sent the 2007 Release to Iowa to be recorded. Patterson assumed, based on Rogers's representation, that it was too late to stop recordation of the 2007 Release.

No third deed of trust for Heritage Park in favor of Patterson was ever recorded. Patterson also never received the additional security in Rogers's home and stock, or any further payments on the loan. Due to the 2007 Release, Patterson did not receive notice of, and was not a participant in, the short sale by Eller Development, Phinn LC, and Rogers of West Towne. West Towne sold for $20 million; Building "E" sold for $2,787,754.70.

Patterson sued Rogers (and others) in state court on May 4, 2009, for, inter alia, fraud, breach of contract, and breach of fiduciary duty. The suit was stayed as to Rogers on July 14, 2009, when he filed his chapter 7 bankruptcy petition.

**B.    Postpetition Facts.**

Patterson filed his nondischargeability complaint against Rogers on October 2, 2009, seeking to except from discharge his debt for damages suffered due to Rogers's alleged fraud under § 523(a)(2)(A). Patterson prayed for damages of $1,754,666.67, the amount owed on the loan, punitive damages in the amount of

$5 million, and attorney's fees and costs.

On February 5, 2010, Patterson moved for relief from stay to prosecute his fraud claim against Rogers in state court. The bankruptcy court denied Patterson's motion and ordered a trial limited to nondischargeability on liability for the fraud claim, reserving the issue of damages to the state court.

The bankruptcy court conducted a trial on Rogers's liability on November 8, 9, 10 and 12, 2010.[3] Rogers admitted telling Patterson that in exchange for the 2007 Release he would provide Patterson the additional security of his home and stock, besides a deed of trust in Heritage Park. However, according to Rogers, the undated note reflecting the additional security was only a "placeholder" to appease Patterson just in case the Heritage Park deed of trust did not arrive in time, prior to Patterson signing the 2007 Release. Rogers testified that he told Patterson the undated note was only a "placeholder," and that he told Patterson he never intended to give him the additional security. Rogers testified that as of June 8, 2007, he had no equity in his home.

Rogers further testified that the purpose of the 2007 Release was to give Patterson some security in Heritage Park, as opposed to his leaving it on West Towne, which had no equity. According to Rogers, Eller wanted to leave Patterson's security in West Towne. Rogers denied telling Patterson that he had to sign the 2007 Release on June 8, 2007, but admitted that this was around the time the short sale on West Towne was taking place.

---

[3] Because the bankruptcy court entered judgment in favor of Patterson with respect to his debt in connection with the 2005 Release and Rogers is not appealing that issue, we focus on the 2007 Release and discuss the 2005 Release only where necessary.

Rogers testified that no proceeds from the short sale of West Towne were available beyond the first deeds of trust.

Patterson testified that prior to his signing the 2007 Release, Rogers did not disclose that Patterson's deed of trust on Heritage Park would be in third position behind Gridiron investors. Patterson testified that Rogers never told him the value of the additional security of the home and stock, but they did discuss that Heritage Park had over $1 million in equity, and Patterson assumed the home and stock had "some" value. Patterson also testified that Rogers never told him that the undated note was merely a "placeholder;" Patterson believed he was getting an interest in Heritage Park, plus Rogers's home and stock.

Contrary to Rogers's testimony, Eller testified that the purpose of the 2007 Release was to pay Patterson, and that he agreed with the decision to give Patterson a deed of trust in Heritage Park in exchange for the 2007 Release. Eller also testified that Heritage Park ultimately sold for only $380,000.

The bankruptcy court announced its ruling in favor of Rogers on Patterson's complaint on December 13, 2010. The court found that no fraud existed as to either the 2005 Release or the 2007 Release. As to the 2007 Release, the court found that Patterson never established that Rogers represented to Patterson that his position in Heritage Park would be something better than third position. As for the credibility of Patterson and Rogers, the court found that neither witness was more credible than the other. At the end of its oral ruling, the court articulated its belief that the measure of damages should be the value, if any, of the collateral Patterson released at the time, not the face

- 11 -

amount of the note. A judgment in favor of Rogers was entered that same day.

Patterson timely moved to alter/amend judgment, asking the court to find Rogers liable for fraud with respect to both Releases and that it strike any findings it made regarding the scope and/or measure of damages. At the hearing on that motion on January 27, 2011, the bankruptcy court reversed its decision in part, finding that Rogers was liable to Patterson for fraud based on the 2005 Release. It denied Patterson's motion with respect to the 2007 Release. As for damages, the court recognized that while the state court would be determining that issue, it remained of the view that the appropriate measure of nondischargeable damages was the loss in value of Patterson's security position caused by the 2005 Release and his loss of priority.

On January 27, 2011, the court entered an amended judgment in favor of Patterson based on the fraudulent 2005 Release. The amended judgment also set the measure of nondischargeable damages as the diminution, if any, in the value of Patterson's security as a result of the 2005 Release and Patterson's attendant loss of priority.

On February 10, 2011, Patterson timely filed a second motion to alter/amend judgment, contending that because the trial was limited to liability, the amended judgment erroneously imposed a measure of damages without a trial on the matter. On that same date, Patterson filed a motion for attorney's fees and costs

based on the fee provision in the Purchase Agreement.[4]

The bankruptcy court held a hearing on Patterson's second motion to alter/amend judgment and his motion for attorney's fees and costs on March 4, 2011. It denied Patterson's motion for fees and costs because his fraud claim based on the 2005 Release did not "arise out of" the Purchase Agreement. As for the damages issue, the court stated it was "very mindful of not wanting to direct the state court to do anything" or "preclud[e] the possibility that there might be other damages recoverable against other parties . . . ." Hr'g Tr. (Mar. 4. 2011) 24:21-22, 24:19-21. Nonetheless, in its restated findings dated March 23, 2011, the bankruptcy court found: "Defendant Daryl J. Rogers is liable to Plaintiff Howard Patterson for the resulting diminution in value of plaintiff's security for the Gridiron Development LLC note, and that liability is NONDISCHARGEABLE pursuant to 11 U.S.C. § 523(a)(2)(A)."

The bankruptcy court issued two minute orders denying both of Patterson's motions on March 4, 2011. Patterson timely filed his notice of appeal of the minute orders. On March 23, 2011, the court entered formal orders denying Patterson's second motion to alter/amend judgment on the damages issue and his motion for attorney's fees and costs on March 23, 2011. A second amended judgment was also entered on March 23 to correct certain grammatical errors in the amended judgment.

---

[4] As the initial prevailing party, Rogers had moved for attorney's fees on the same basis as Patterson - under the fee provision in the Purchase Agreement. However, once Rogers was no longer the prevailing party, he took a contrary position in his opposition to Patterson's request for fees contending that no fees were available under the Purchase Agreement.

Patterson timely filed an amended notice of appeal regarding the March 23, 2011 rulings on April 1, 2011. On May 18, 2011, the bankruptcy court vacated the second amended judgment and entered a Third Amended Judgment awarding Patterson statutory costs as prevailing party.

Patterson timely filed his second amended notice of appeal on June 1, 2011, of the Third Amended Judgment, the bankruptcy court's Restated and Corrected Findings of Fact and Conclusions of Law with respect to its findings on the 2007 Release and the measure of damages, and the orders denying his second motion to alter/amend judgment and motion for attorney's fees and costs.

## II. JURISDICTION

The bankruptcy court had jurisdiction under 28 U.S.C. §§ 157(b)(2)(I) and 1334. We have jurisdiction under 28 U.S.C. § 158.

## III. ISSUES

1. Did the bankruptcy court clearly err in determining that no fraud existed as to the 2007 Release?

2. Did the bankruptcy court improperly limit Patterson's damages?

3. Did the bankruptcy court abuse its discretion in determining that Patterson was not entitled to attorney's fees and costs?

## IV. STANDARDS OF REVIEW

In claims for nondischargeability, the Panel reviews the bankruptcy court's findings of fact for clear error and conclusions of law de novo and applies de novo review to "mixed questions" of law and fact that require consideration of legal concepts and the exercise of judgment about the values that

- 14 -

animate the legal principles. Oney v. Weinberg (In re Weinberg), 410 B.R. 19, 28 (9th Cir. BAP 2009). Witness credibility findings are entitled to special deference and are also reviewed for clear error. In re Weinberg, 410 B.R. at 28; Rule 8013. A finding is clearly erroneous if it is illogical, implausible, or without support in the record. United States v. Hinkson, 585 F.3d 1247, 1261 (9th Cir. 2009)(en banc). "When there are two permissible views of the evidence, the trial judge's choice between them cannot be clearly erroneous." Village Nurseries v. Gould (In re Baldwin Builders), 232 B.R. 406, 410 (9th Cir. BAP 1999).

Whether the trial court selected the correct legal standard in computing damages is reviewed de novo. Mackie v. Rieser, 296 F.3d 909, 916 (9th Cir. 2002).

Whether a state statute permits attorney's fees is reviewed de novo. Kona Enter. Inc. v. Estate of Bishop, 229 F.3d 877, 883 (9th Cir. 2000). The denial of attorney's fees requested under state law is reviewed for an abuse of discretion or an erroneous application of the law. Renwick v. Bennett (In re Bennett), 298 F.3d 1059, 1063 (9th Cir. 2002); Champion Produce, Inc. v. Ruby Robinson Co., 342 F.3d 1016, 1020 (9th Cir. 2003). To determine whether the bankruptcy court abused its discretion, we conduct a two-step inquiry: (1) we review de novo whether the bankruptcy court "identified the correct legal rule to apply to the relief requested" and (2) if it did, whether the bankruptcy court's application of the legal standard was illogical, implausible or "without support in inferences that may be drawn from the facts in the record." Hinkson, 585 F.3d at 1261-62.

- 15 -

## V. DISCUSSION

**A.   The bankruptcy court did not clearly err in finding that no fraud existed based on the 2007 Release.**

To prevail on a claim under § 523(a)(2)(A), a creditor must demonstrate five elements: (1) misrepresentation, fraudulent omission or deceptive conduct by the debtor; (2) knowledge of the falsity or deceptiveness of his statement or conduct; (3) an intent to deceive; (4) justifiable reliance by the creditor on the debtor's statement or conduct; and (5) damage to the creditor proximately caused by its reliance on the debtor's statement or conduct.  In re Weinberg, 410 B.R. at 35 (citing Turtle Rock Meadows Homeowners Ass'n v. Slyman (In re Slyman), 234 F.3d 1081, 1085 (9th Cir. 2000)).  "The creditor bears the burden of proof to establish all five of these elements by a preponderance of the evidence."  Id. (citing In re Slyman, 234 F.3d at 1085).

We begin by noting the bankruptcy court found that neither of the men was more credible than the other.  In its findings on December 13, 2010, the bankruptcy court found that no fraud existed as to the 2007 Release because Patterson failed to establish that Rogers ever represented to Patterson that he would be in second position on Heritage Park.  Patterson's attempt to stop the transaction when he found out he would be in third position merely highlighted that no clear agreement existed on the security position.  In the bankruptcy court's opinion, the lack of the additional security in Rogers's home and stock is not what caused the transaction to stop there; it was Patterson's third security position in Heritage Park.

The bankruptcy court made additional findings regarding the

- 16 -

2007 Release at the January 27, 2011 hearing on Patterson's motion to alter/amend judgment. Because the witnesses had "roughly equivalent credibility," the court found that the additional security of Rogers's home and stock could have been a placeholder as Rogers said and not intended for Patterson, but Patterson had failed to prove his case by a preponderance of the evidence on that issue. Hr'g Tr. (Jan. 27, 2011) 4:9-20.

Patterson contends the bankruptcy court clearly erred in finding that no fraud occurred as to the 2007 Release in light of the overwhelming evidence to the contrary. We disagree. Despite his statement to Patterson that West Towne was in foreclosure, which was false, Rogers's email to Megan Tjernagel reflects his belief at the time that West Towne had no value for Patterson, who was in second position due to the 2005 Release. In lieu of Patterson's Second Mortgage on West Towne, Rogers offered him a deed of trust on Heritage Park. Patterson testified that it was "his understanding" that his deed would be recorded in second position. Notably, and as the bankruptcy court found, Patterson did not establish that Rogers expressly told him he would be in second position on Heritage Park. As for whether Rogers represented to Patterson prior to the 2007 Release that he would give Patterson the additional security of the home and stock, or it was just a "placeholder" as Rogers claimed, the court found both witnesses equally credible on that issue, and thus Patterson failed to meet his burden that a false representation had been made. No deed of trust was ever recorded for Patterson on Heritage Park because Patterson directed Heidi Schwalbe not to record it unless he was placed in a second position.

- 17 -

In addition to the bankruptcy court's findings, we fail to see what damage was proximately caused by Patterson's 2007 Release that he did not already suffer by the 2005 Release. In other words, what additional damages would Patterson be entitled to by the 2007 Release that he is not already entitled to due to the fraudulent 2005 Release? It appears that but-for the 2005 Release, Patterson may have been paid in full on his note by being in first position on at least one of the buildings in West Towne. Thus, he may be able to establish damages as the full amount due on the note. The record is not clear, and Patterson has not articulated, what the 2007 Release would add to these damages. In any event, Eller testified that Heritage Park ultimately sold for only $380,000. If true, then even if Patterson was in second position on Heritage Park, he would have received nothing, as UMPQUA's loan far exceeded that amount. Perhaps something of value could have been had on the additional security of Rogers's home and stock, but the bankruptcy court found that Patterson failed to meet his burden on whether he was ever entitled to that additional security. Moreover, the evidence established that no equity existed in Rogers's home at the time of the 2007 Release, and no value was ever provided in the record for the stock. Patterson admitted that Rogers never told him the value of the additional security in Rogers's home or stock.

We also fail to see how Patterson, who at the time of the 2007 Release believed he was in first position on West Towne and apparently unaware of his second position due to the 2005 Release, justifiably relied on any representation by Rogers that

the West Towne property was in foreclosure. Surely, Patterson had not commenced any foreclosure proceedings on West Towne, and as the first position lienholder, he would have received notice of any foreclosure proceedings by a junior.

Accordingly, we cannot conclude on this record that the bankruptcy court's finding that no fraud existed as to the 2007 Release was illogical, implausible, or without support in the record viewed in its entirety. <u>Hinkson</u>, 585 F.3d at 1261-62. Even if we as the fact finder would have weighed the evidence differently, "when there are two permissible views of the evidence, the trial judge's choice between them cannot be clearly erroneous." <u>In re Baldwin Builders</u>, 232 B.R. at 410. We AFFIRM this portion of the Third Amended Judgment and the bankruptcy court's order denying Patterson's second motion to alter/amend judgment on this issue.

**B.  The bankruptcy court erred in limiting Patterson's damages.**

While the parties and the bankruptcy court agreed that the state court would determine Patterson's damages, if any, the Third Amended Judgment reads in relevant part:

> The liability of defendant, Daryl J. Rogers to plaintiff Howard Patterson for the diminution, if any, in value of his security for the note of Gridiron Development LLC dated May 27, 2005, to him . . . as a result of the release dated July 28, 2005 . . ., of the mortgage initially granted by Eller Development, Inc., to secure that note . . ., and Mr. Patterson's attendant loss of priority, is NONDISCHARGEABLE pursuant to 11 U.S.C. § 523(a)(2)(A).

Patterson contends that although the bankruptcy court had to find some damage proximately caused by Rogers's fraudulent conduct to establish liability for fraud, the court improperly made a finding regarding the scope of damages without permitting

- 19 -

the parties a trial on the issue. We agree.

The record reflects the bankruptcy court's clear concern about crafting a judgment that did not limit Patterson's or any other party's damages. However, we conclude the language in the Third Amended Judgment is an improper limitation on Patterson's damages. It essentially precludes the state court from determining whether Patterson suffered any consequential or punitive damages, which he prayed for in his nondischargeability complaint. At the very least, it appears to render such damages, should the state court find any, dischargeable. This is contrary to Cohen v. de la Cruz, 523 U.S. 213 (1998)(holding that any debts incurred as a result of debtor's fraud, including attorney's fees or punitive damages, are nondischargeable).

As further error, the bankruptcy court did not articulate on what authority it was limiting Patterson's damages. At this point, it is unclear whether California or Iowa law would apply to this issue, which may dictate different results. Accordingly, we REVERSE the damages portion of the Third Amended Judgment to the extent it imposes any limitation on Patterson's damages.

**C. The bankruptcy court did not abuse its discretion in denying Patterson's motion for attorney's fees and costs.**

The bankruptcy court found that Patterson was the prevailing party in his nondischargeability action. Rogers does not contest that finding. However, the court rejected Patterson's argument for attorney's fees and costs based on the fee provision in the Purchase Agreement, concluding that the Agreement was fully performed and Patterson's fraud claim did not "arise out of" it:

> So it seems to me once you've got the fully performed contract and the fraud that's established does not relate to the performance of that contract, rather to a note received in payment and the security for that note under that contract, I just don't see how it arises out of the original purchase and sale agreement.
>
> . . . .
>
> But the connection is too tenuous for me to conclude that the fraud in the release of the security arises out of the original agreement.

Hr'g Tr. (Mar. 4, 2011) 17:22-18:3, 18:6-9.

Patterson contends the bankruptcy court erred in determining his fraud claim did not "arise out of" the Purchase Agreement. In Patterson's view, the Purchase Agreement was the sine qua non for the 2005 purchase-sale itself, the 2005 First Mortgage, the 2005 Release, which was obtained fraudulently, and the Second Mortgage. In other words, the Purchase Agreement is the "but for" to the entire transaction between the parties.

While no independent right exists to attorney's fees under the Bankruptcy Code, a prevailing party may be awarded attorney's fees in a nondischargeability action if such fees are recoverable outside of bankruptcy under state or federal law. Fry v. Dinan (In re Dinan), 448 B.R. 775, 785 (9th Cir. BAP 2011)(citing Cohen, 523 U.S. at 223). California law permits recovery for attorney's fees under two separate provisions.

California Civil Code ("CCP") § 1717[5] is narrowly applied

---

[5] CCP § 1717 provides:

In any action on a contract, where the contract specifically provides that attorney's fees and costs, which are incurred to enforce that contract, shall be awarded either to one of the parties or to the prevailing party, then the party who
(continued...)

- 21 -

and allows a party to recover attorney's fees only if the action involves litigation of a contract claim. <u>Redwood Theaters, Inc. v. Davison (In re Davison)</u>, 289 B.R. 716, 723 (9th Cir. BAP 2003) (citing <u>Santisas v. Goodin</u>, 951 P.2d 399, 409 (Cal. 1998)). Because Patterson's nondischargeability action was based entirely on the tort of fraud, CCP § 1717 is inapplicable. <u>Santisas</u>, 951 P.2d at 409; <u>Xuereb v. Marcus & Millichap, Inc.</u>, 5 Cal. Rptr. 2d 154, 157 (Cal. Ct. App. 1992).

Nonetheless, CCP § 1021[6] permits recovery of attorney's fees by agreement between the parties and does not limit a fee recovery to actions on the contract. <u>In re Davison</u>, 289 B.R. at 724. Thus, attorney's fees may be recoverable under CCP § 1021 even though they are not recoverable under CCP § 1717. <u>Id.</u> (citing <u>3250 Wilshire Blvd. Bldg. v. W.R. Grace & Co.</u>, 990 F.2d 487, 489 (9th Cir. 1993)). If an attorney's fee provision exists in an agreement between the parties, the court looks to the agreement's language to determine whether an award of attorney's fees is permitted in a tort action. <u>Id.</u>

The fee provision in paragraph 27 of the Purchase Agreement reads in relevant part:

---

[5](...continued)
is determined to be the party prevailing on the contract, whether he or she is the party specified in the contract or not, shall be entitled to reasonable attorney's fees in addition to other costs (emphasis added).

[6] CCP § 1021 provides in relevant part:

Except as attorney's fees are specifically provided for by statute, the measure and mode of compensation of attorneys . . . is left to the agreement, express or implied, of the parties . . . .

- 22 -

> In any action, proceeding, or arbitration between Buyer and Seller arising out of this Agreement, the prevailing Buyer or Seller shall be entitled to reasonable attorney fees and costs from the non-prevailing party Buyer or Seller . . . . (emphasis added).

A contract provision authorizing fees in an action to interpret or enforce the contract does not permit attorney's fees on tort claims. Scientists, 951 P.2d at 414 n.9; Exxess Electronixx v. Heger Realty Corp., 75 Cal. Rptr. 2d. 376, 383 (Cal. Ct. App. 1998); In re Davison, 289 B.R. at 725. However, the fee provision at issue here is not so limiting. California courts have held that contractual language providing for fees in any action arising from, or relating to, the contract is broad enough to encompass recovery of attorney's fees for tort actions. Scientists, 951 P.2d at 405; Xuereb, 5 Cal. Rptr. 2d at 157; Gil v. Mansano, 17 Cal. Rptr. 3d 420, 423 (Cal. Ct. App. 2004).

The bankruptcy court appeared to recognize that Patterson, as prevailing party, could be entitled to attorney's fees for his tort action against Rogers based on the broad language of the Purchase Agreement. However, it ultimately concluded that Patterson's claim for fraud against Rogers for the 2005 Release did not "arise out of" the Purchase Agreement.

Whether Patterson is entitled to attorney's fees turns on whether his nondischargeability action for fraud entailed an action "arising out of" the Purchase Agreement.

> "To answer this question, we apply the ordinary rules of contract interpretation. 'Under statutory rules of contract interpretation, the mutual intention of the parties at the time the contract is formed governs interpretation. . . . Such intent is to be inferred, if possible, solely from the written provisions of the contract. . . . The "clear and explicit" meaning of these provisions, interpreted in their "ordinary and popular sense," unless "used by the parties in a

- 23 -

technical sense or a special meaning is given to them by usage" . . . , controls judicial interpretation. . . . Thus, if the meaning a layperson would ascribe to contract language is not ambiguous, we apply that meaning. . . .'"

Exxess Electronixx, 75 Cal. Rptr. 2d at 383 (quoting Scientists, 951 P.2d at 405 (citations omitted)).

The parties do not claim they ascribed to the phrase "arising out of" a particular or special meaning. Accordingly, we must interpret that phrase in its ordinary and popular sense. To "arise" means "to originate from a source" or "to come into being or to attention." Merriam-Webster's Collegiate Dictionary 62 (10th ed. 2000). Did Patterson's fraud claim based on the 2005 Release "arise out of" the Purchase Agreement? We conclude that it did not. We agree with the bankruptcy court's finding that the Purchase Agreement was fully performed upon the close of escrow. The fraud occurred after that date. No necessary causal connection exists between Patterson's release of his First Mortgage in West Towne in 2005 and the Purchase Agreement. Patterson's fraud claim arose from his role as lender to Gridiron, not as the seller in the Purchase Agreement for Heritage Park. Therefore, Patterson's cause of action did not "arise from" the Purchase Agreement; it was independent of that basic contractual arrangement.[7]

---

[7] We further observe that paragraph 22 in the Purchase Agreement regarding dispute resolution contains similar but broader language than that in paragraph 27:

Buyer and Seller agree to mediate any dispute or claim arising between them out of the Agreement, or any resulting transaction, before resorting to arbitration or court action.

(continued...)

- 24 -

Perhaps the First Mortgage, which contains an attorney's fee provision, may be a source of recovery for Patterson. However, as the bankruptcy court noted, the First Mortgage was signed by Eller Development, a company in which Rogers apparently has no interest. We further observe that Iowa law would likely apply to the attorney's fee provision in the First Mortgage, and neither party ever presented any Iowa law on this issue. Moreover, the attorney's fee provision in the promissory note, which is subject to California law, appears to apply only to actions enforcing the note.[8]

Accordingly, we conclude that the bankruptcy court did not abuse its discretion in determining Patterson was not entitled to attorney's fees based on the Purchase Agreement.

## VI. CONCLUSION

We AFFIRM the bankruptcy court's Third Amended Judgment, except to the extent it imposed any limitation on Patterson's damages. We REVERSE the damages portion of the Third Amended Judgment, as the issue on the scope and amount of damages will be decided by the state court. We AFFIRM the bankruptcy court's order denying Patterson's motion for attorney's fees and costs.

---

[7](...continued)
Based on this broader language in paragraph 22, one might conclude that the intent of the parties in paragraph 27 was to restrict attorney's fees to matters pertaining only to the Agreement, not later resulting transactions such as releases and recordings of deeds of trust.

[8] The note's fee provision states: "The undersigned [Gridiron], in case of suit on this note, agrees to pay attorney's fees" (emphasis added).

- 25 -