NOT FOR PUBLICATION

**UNITED STATES BANKRUPTCY APPELLATE PANEL**

**OF THE NINTH CIRCUIT**

| | |
|---|---|
| In re: | ) BAP No.  CC-12-1495-PaKiTa |
| | ) |
| JOHN SHART and ELKE GORDON SCHARDT, | ) Bk. No.  10-29973-BR |
| | ) |
| Debtors. | ) Adv. No. 10-02555-BR |
| _____ | ) |
| | ) |
| WENDY HAIG; GREG SADLER; SHOWCASE 81, LLC, | ) |
| | ) |
| Appellants, | ) |
| | ) |
| v. | ) **M E M O R A N D U M**[1] |
| | ) |
| JOHN SHART; ELKE GORDON SCHARDT, | ) |
| | ) |
| Appellees. | ) |
| _____ | ) |

Argued and Submitted on March 22, 2013,
at Pasadena, California

Filed - April 2, 2013

Appeal from the United States Bankruptcy Court
for the Central District of California

Honorable Barry Russell, Bankruptcy Judge, Presiding

_____

Appearances:    Jesse Sequoia Finlayson of Finlayson Williams
                Toffer Roosevelt & Lilly LLP argued for appellants
                Wendy Haig, Greg Sadler, and Showcase 81, LLC;
                Elke Gordon Schardt argued for appellees John Shart
                and Elke Gordon Schardt.

_____

Before: PAPPAS, KIRSCHER and TAYLOR, Bankruptcy Judges.

_____

[1]  This disposition is not appropriate for publication.
Although it may be cited for whatever persuasive value it may have
(see Fed. R. App. P. 32.1), it has no precedential value.  See 9th
Cir. BAP Rule 8013-1.

-1-

Creditors Wendy Haig ("Ms. Haig"), Greg Sadler ("Mr. Sadler") and their company, Showcase 81, LLC (together, "Creditors") appeal that portion of the judgment of the bankruptcy court holding that Creditors' claims against chapter 7[2] debtor Elke Gordon-Schardt ("Ms. Schardt") were not excepted from discharge in her bankruptcy case under § 523(a)(2)(A). While we AFFIRM the bankruptcy court's determination that Ms. Schardt was not directly liable for fraud, we VACATE in part the bankruptcy court's judgment and REMAND the action to the bankruptcy court to consider whether Ms. Schardt's spouse's fraud may be imputed to her.

**FACTS**

Ms. Haig and Mr. Sadler are a married couple who lived in Santa Fe, New Mexico. They are active equestrians, own horses, and participate in horse shows.

Ms. Schardt is married to John Hans Shart ("Mr. Shart" and, together with Ms. Schardt, "Debtors"). Mr. Shart lives in Lynville, Tennessee; Ms. Schardt resides in Acton, California. Mr. Shart is the 100 percent owner of Malibu Equestrian Estates, Inc. ("MEE"). Mr. Shart and MEE operated a horse-related business under the business name Greystone Equestrian Center ("Greystone") in Lynville, Tennessee. The 85-acre parcel where Greystone operates is owned jointly by Mr. Shart and Ms. Schardt (the "Farm"). Ms. Schardt is an attorney with a law practice in Acton, California.

---

[2] Unless otherwise indicated, all chapter, section and rule references are to the Bankruptcy Code, 11 U.S.C. §§ 101-1532, and to the Federal Rules of Bankruptcy Procedure, Rules 1001-9037. The Federal Rules of Civil Procedure are referred to as Civil Rules.

From 2002 through 2008, Creditors purchased horses from Shart or MEE. Until early 2007, all of the purchased horses were boarded at facilities in New Mexico not affiliated with Mr. Shart or MEE.

Ms. Haig and Mr. Shart developed both a business relationship and friendship from 2002 through 2008. Ms. Haig would purchase horses and rely on Mr. Shart for training advice. They met socially, with Ms. Haig occasionally staying at Greystone.

Even in the early period of their relationship, there was considerable confusion over Mr. Shart's billing for the purchase and care of Creditors' horses. On or about November 22, 2006, Ms. Haig sent Mr. Shart a letter, listing payments she had made to Mr. Hart or MEE between May 2005 and September 2006 totaling $1,849,000.00, alleging that the payments were a combination of purchases and loans, and asking Mr. Shart's help in identifying the purpose of each payment.

In February 2007, Ms. Haig and Mr. Shart attended a horse show in Gulfport, Mississippi. While at the Gulfport show, Ms. Haig agreed to have at least the majority of her horses boarded and trained at Greystone. Between March 2007 and December 2008, Creditors boarded on average twenty to twenty-five horses at Greystone.

On or about January 23, 2007, Ms. Haig allegedly purchased two motor homes, paying $245,495.00 for the first ("Motor Home 1") and $240,973.00 for the second ("Motor Home 2"). The purchases were negotiated and implemented with the dealer by Mr. Shart. Title to Motor Home 1 was placed in Ms. Haig's name, but title to Motor Home 2 was placed in Mr. Shart's name. Ms. Haig would later

claim that she instructed Mr. Shart to place title to both motor homes in her name.

In 2007, Mr. Shart constructed a barn to house some of Creditors' horses (the "Barn") and to provide living quarters for Ms. Haig during Greystone visits and to provide four suites for grooms. It is disputed whether Mr. Shart or Ms. Haig provided the funds for the Barn's construction. Ms. Haig also argued that Mr. Shart promised to construct the Barn as an incentive for Creditors to board the horses at Greystone.

On May 10, 2007, Jerry and Beverly Flowers recorded a deed transferring a fourteen-acre parcel adjacent to the Farm to Mr. Shart (the "Flowers Land"). Title was vested in Mr. Shart, but the parties dispute whether Debtors or Creditors provided the funds for the purchase of the Flowers Land, and whether title should have been vested in Mr. Shart or Ms. Haig.

On September 14, 2007, Ms. Haig allegedly paid $162,250.43 for the purchase of a Kenworth truck. Mr. Shart negotiated the purchase with the dealer. Title to the truck was placed in the name of Greystone. In her testimony, Ms. Haig alleged that, although she authorized Mr. Shart to negotiate the purchase of the truck, she expressly instructed him to title the truck in her name.

Between 2007 and 2009, there were continuing disputes between Debtors and Creditors regarding boarding fees, documentation on invoices, and the authority of Mr. Shart to sell horses stabled by Creditors at Greystone. In one instance, two of Creditors' horses were sold by Mr. Shart on December 18, 2008. Ms. Haig was present and objected to the sale. Given the parties' escalating

-4-

disagreements, on January 7-9, 2009, Creditors' representatives traveled to the Farm to pick up the remaining horses.  Mr. Shart demanded payment from Creditors of alleged and disputed arrearages before releasing the horses, and eventually ordered Creditors' representatives to leave without recovering the horses.

On February 9, 2009, Creditors sued Mr. Shart, Ms. Schardt, and MEE in state court.  Haig v. Shart, dkt. no. 4394 (Chancery Ct., Giles Cnty., Tennessee, February 9, 2009).  The complaint alleged that the defendants made multiple misrepresentations to Creditors regarding the acquisition and sale of horses, and that there were disputed expenses for trade shows, construction costs, real estate, personal property acquisitions, and other matters related to the defendants' activities on behalf of Creditors.  Notably, the complaint focused on the actions of Mr. Shart, and only sought recovery against Ms. Schardt for "unjust enrichment."  On March 9, 2009, the Tennessee Chancery Court entered an Agreed Temporary Injunction, prohibiting Debtors from selling any additional horses or personal property owned by Creditors, including the Kenworth truck.

Creditors' representatives returned to the Farm on March 5, 2009, to remove the remaining horses and personal property of Creditors.  Mr. Shart permitted them to remove eleven horses and some other items of property.

By April 2009, Creditors had determined that at least five of their horses were still stabled at Greystone.  The state court entered an order granting Creditors possession of the horses, their request for injunctive relief, and authorization to inspect the Greystone premises.  The bankruptcy court would ultimately

-5-

find that Creditors never recovered seven of their horses.

In November 2009, Mr. Shart sold the Kenworth truck to MHC Kenworth for $80,000.

Debtors filed a chapter 11 petition in the Central District of California on May 18, 2010. Debtors indicated in their schedule A that they owned the Barn and the Flowers Land. Schedule F listed a disputed, contingent, and unliquidated debt to Creditors for $1 million. On September 21, 2010, the bankruptcy court converted Debtors' case to a chapter 7 case, and a trustee was appointed.

Creditors filed a proof of claim in the bankruptcy case on January 21, 2011, in the amount of $2,600,000. Debtors objected to the claim on June 3, 2011, arguing that they did not owe the money.

Meanwhile, on August 23, 2010, Creditors filed an adversary proceeding against Debtors. As amended on March 9, 2011, Creditors' complaint alleged that Debtors made misrepresentations to Creditors with the intent of deceiving them into paying $1.1 million to construct the Barn and purchase the Flowers Land, among other things, and that this debt should be excepted from discharge under § 523(a)(2)(A). The complaint further alleged that Debtors had engaged in fraud or defalcations as fiduciaries related to the $1.1 million, and that the debt should be excepted from discharge under § 523(a)(4). Finally, the complaint asserted that Debtors willfully, maliciously, and intentionally injured the Creditors and converted their property and the resulting debt should be excepted from discharge under § 523(a)(6). In an answer filed on April 6, 2011, Debtors generally disputed these allegations.

-6-

On December 29, 2011, the bankruptcy court approved the parties' Joint Pretrial Order both setting forth undisputed facts (which are incorporated in this factual discussion), and outlining the disputed issues of fact and law.

Over several months, the bankruptcy court conducted a five-day consolidated trial concerning Debtors' objection to Creditors' claim, and Creditors § 523(a) complaint, which concluded on July 25, 2012. In addition to the documentary evidence submitted by the parties, the bankruptcy court heard testimony from numerous witnesses, including Ms. Haig, Mr. Sadler, Mr. Shart and Ms. Schardt.

After listening to the parties' closing arguments, the bankruptcy court orally announced its decision. In part, the court stated that Mr. Shart's "credibility, quite frankly, is zero as far as I'm concerned. . . . It was clear to me that he will say and did say at any time in this case what he wanted to." Trial Tr. 101:14-23, July 25, 2012. The court then concluded that it agreed with all arguments made by Creditors that Mr. Shart had intentionally made false statements to Haig. Trial Tr. 102:1-2. The court examined each component of Creditor's claim, ruling which components would be allowed, which would be excepted from discharge, and which would not.

As to Creditors' § 523(a) claims against Ms. Schardt, the bankruptcy court concluded that she had not been actively involved in the fraudulent behavior and representations of Mr. Shart: "Other than let's say at the end helping with e-mails and things, I don't think she had anything to do with the actual transactions which are the basis for the claims as well as

nondischargeability." Trial Tr. 100:21-25. Having concluded that she had nothing to do with the false representations or fraudulent activity of Mr. Shart, the bankruptcy court determined that Creditors' claims against her would not be excepted from discharge. In particular, as to Creditors' arguments that Ms. Schardt could be held liable because a spouse's fraud can be imputed to the other spouse under principles of agency and partnership, the court ruled "I don't think there's any imputation[.]" Trial Tr. 100:3-4. The court provided no explanation and made no findings to support that ruling, except to question the correctness of the Panel's decision in Tsurukawa v. Nikon Precision, Inc. (In re Tsurukawa), 287 B.R. 515 (9th Cir. BAP 2002) (Tsurukawa II).

On September 13, 2012, the bankruptcy court entered a judgment in favor of Creditors and against Mr. Shart for $860,726.43 as a debt excepted from discharge under § 523; although the judgment did not specify which subsection of that statute applied. The judgment also declared that Creditors' claims against Ms. Schardt were discharged.[3]

Creditors filed a timely appeal on September 27, 2012, challenging only that part of the Judgment holding that their claims against Ms. Schardt were not excepted from discharge.

**JURISDICTION**

The bankruptcy court had jurisdiction under 28 U.S.C. §§ 1334

---

[3] In their brief, Creditors note that, subsequent to entry of the judgment on appeal, on October 29, 2012, the bankruptcy court entered an order allowing the Creditors' claim in the bankruptcy case for $1,817,104.19 as "a community claim under section 524(a)(3)." This order was not appealed.

-8-

and 157(b)(2)(I).  We have jurisdiction under 28 U.S.C. § 158.

**ISSUES**

Whether the bankruptcy court erred in ruling that Ms. Schardt was not directly liable for fraud.

Whether the bankruptcy court erred in deciding that Mr. Shart's liability to Creditors for fraud should not be imputed to Ms. Schardt for purposes of § 523(a)(2)(A).

**STANDARDS OF REVIEW**

Whether a claim is excepted from discharge under § 523(a)(2)(A) presents mixed issues of law and fact which we review de novo.  Diamond v. Kolcum (In re Diamond), 285 F.3d 822, 826 (9th Cir. 2001).  We review the bankruptcy court's findings of fact for clear error.  Honkanen v. Hopper (In re Honkanen), 446 B.R. 373, 378 (9th Cir. BAP 2011).  Clear error is found when the reviewing court has a definite and firm conviction that a mistake has been committed.  Lewis v. Ayers, 681 F.3d 992, 998 (9th Cir. 2012).  De novo review requires the Panel to independently review an issue, without giving deference to the bankruptcy court's conclusions.  See Cal. Franchise Tax Bd. v. Wilshire Courtyard (In re Wilshire Courtyard), 459 B.R. 416, 423 (9th Cir. BAP 2011) (citing First Ave. W. Bldg., LLC v. James (In re Onecast Media, Inc.), 439 F.3d 558, 561 (9th Cir. 2006)).

**DISCUSSION**

**I.**

**The bankruptcy court did not err in ruling that Ms. Schardt was not directly liable for fraud under § 523(a)(2)(A).**

At the hearing in this appeal, counsel for Creditors seemed

-9-

to concede that Creditors were not challenging the bankruptcy court's ruling that Ms. Schardt had not directly engaged in any fraud. In the event the Panel is incorrect in this assumption, however, we affirm the bankruptcy court's conclusion that Ms. Schardt did not have direct liability for fraud.

This appeal has been characterized by a high degree of imprecision. Creditors' complaint sought exceptions to discharge for the full amount of their claims against both Mr. Shart and Ms. Schardt under § 523(a)(2)(A), (a)(4) and (a)(6). In trial argument and post-trial briefing, the parties continued to dispute all three subsections of § 523. However, the bankruptcy court's judgment simply excepted from discharge Creditors' claim against Mr. Shart personally under "§ 523", with no reference to the subsections. Because in its ruling the court did not discuss Debtors' fiduciary duties, embezzlement, nor willful and malicious conduct, but rather focused on Mr. Shart's misrepresentations and fraud, we assume that the bankruptcy court's judgment granted the exception to discharge against Mr. Shart under § 523(a)(2)(A).

This assumption is buttressed in Creditors' briefs. They focus their argument on appeal on whether the bankruptcy court erred in not imputing the fraud of Mr. Shart to Ms. Schardt based on this Panel's rulings in Tsurukawa II. Tsurukawa II, discussed below, deals solely with imputing fraud to a spouse under § 523(a)(2)(A). Since Creditors included no arguments on appeal relating to Ms. Schardt's fiduciary duties, embezzlement, or willful and malicious conduct, we assume in this section that Creditors challenge only the bankruptcy court's ruling that there was no active involvement by Ms. Schardt in Mr. Shart's

-10-

misrepresentations and fraud under § 523(a)(2)(A).

Section 523(a)(2)(A) provides that: "A discharge . . . does not discharge an individual debtor from any debt . . . (2) for money, property, services, or an extension, renewal, or refinancing of credit, to the extent obtained, by — (A) false pretenses, a false representation, or actual fraud[.]"  To demonstrate to the bankruptcy court that a debt should be excepted from discharge under § 523(a)(2)(A), a creditor must prove five elements: (1) misrepresentation, fraudulent omission or deceptive conduct by the debtor; (2) knowledge of the falsity or deceptiveness of his statement or conduct; (3) an intent to deceive; (4) justifiable reliance by the creditor on the debtor's statement or conduct; and (5) damage to the creditor proximately caused by its reliance on the debtor's statement or conduct. Ghomeshi v. Sabban (In re Sabban), 600 F.3d 1219, 1222 (9th Cir. 2010); Oney v. Weinberg (In re Weinberg), 410 B.R. 19, 35 (9th Cir. BAP 2009).  The creditor bears the burden of proving all five elements by a preponderance of the evidence. Grogan v. Garner, 498 U.S. 279, 291 (1991); In re Weinberg, 410 B.R. at 35.

The bankruptcy court heard testimony from Ms. Haig that Ms. Schardt never made a false representation to her about the financial issues in question:

> COUNSEL FOR DEBTORS: Did [Ms. Schardt] ever tell you anything that later turned out to be false?
>
> HAIG: Well, I doubted — when she solicited me as her client in the Merrill Lynch case, I doubted that she'd ever had an experience with Merrill Lynch, and she stated she — she had had cases before against Merrill Lynch.
>
> THE COURT: But other than that, there was nothing that you found out later was not true as far as you know?

-11-

Even that you apparently have some question about?

HAIG: I have some question about that comment.

THE COURT: But other than that?

HAIG: No, she didn't — I don't think she — I don't know. It was mostly just conversations.

THE COURT: Okay.

Trial Tr. 83:16—84:4, April 26, 2012.

Since we review the bankruptcy court's factual findings for clear error, and because the record includes Ms. Haig's testimony that Ms. Schardt made no false representations to her, the bankruptcy court did not err in concluding that Creditors had not established the elements required for exception to discharge under § 523(a)(2)(A), and instead concluding that "I don't think she had anything to do with the actual transactions which are the basis for the claims as well as nondischargeability." Trial Tr. 100:22-25.

We therefore AFFIRM the bankruptcy court's decision that Ms. Shardt did not engage directly in any fraud.

## II.

**The bankruptcy court made inadequate findings to support its decision not to impute liability to Ms. Schardt for the fraud of her spouse and, consequently, we must vacate the portion of the judgment regarding her and remand for findings consistent with this Panel's holdings in <u>Tsurukawa</u>.**

The second imprecision in this appeal concerns the bankruptcy court's ruling that "I don't think there's any imputation" of Mr. Shart's fraudulent behavior to his spouse, Ms. Schardt. The bankruptcy court had been given extensive briefing from the parties concerning the Panel's published opinion in <u>Tsurukawa II</u>,

-12-

where it held that, even in the absence of any direct fraud, imputation of liability was possible in a § 523(a)(2)(A) proceeding where the court finds a partnership or agency relationship existed between the spouses. 287 B.R. at 527. Based on our review of the record, evidence was produced by Creditors which may provide a basis for imputing such liability. Despite this, the bankruptcy court made no findings to support its conclusion that imputation was not appropriate in this case. This is problematic.

Rather than make specific findings based on Tsurukawa or address any of the arguments on imputed liability presented by both parties, the bankruptcy court simply ruled that "the BAP got it wrong." This is not a finding of fact. Simeonoff v. Hiner, 249 F.3d 883, 891 (9th Cir. 2001) (unsupported conclusory statements not findings). Even if, in making this statement, the bankruptcy court decided that it was not required to follow Tsurukawa II, this Panel is bound to follow and enforce its own published decisions in subsequent appeals. In re Sierra Pac. Broadcasters, 185 B.R. 575, 577 n.7 (9th Cir. BAP 1995). We therefore turn our attention once again to the Tsurukawa decisions. Doing so, we conclude we must vacate the portion of the court's judgment regarding Ms. Schardt and remand for reconsideration of whether she was involved in a partnership or agency relationship with Mr. Shart such that his fraudulent behavior should be imputed to Ms. Schardt for the purposes of exception to discharge under § 523(a)(2)(A).

The Panel issued two Tsurukawa decisions. In Tsurukawa v. Nikon Precision, Inc. (In re Tsurukawa), 258 B.R. 192 (9th Cir.

-13-

BAP 2001) (Tsurukawa I), it addressed the exception from discharge of a $2 million stipulated judgment debt against the debtor under § 523(a)(2)(A), based on imputed liability for fraud committed by the debtor's husband. We held that "a marital union alone, without a finding of a partnership or other agency relationship between spouses, cannot serve as a basis for imputing fraud from one spouse to the other." Id. at 198. However, in Tsurukawa I the Panel only inferentially decided whether, based on a finding that an agency or partnership relationship existed between spouses, such a finding would support an exception to discharge. Id. That question was settled affirmatively in Tsurukawa II, 287 B.R. at 519 ("In a § 523(a)(2)(A) action, one spouse's fraud may be imputed to the other spouse under agency principles when, as in this case, they are also business partners.").

The Tsurukawa I panel surveyed the case law regarding imputation of fraud in bankruptcy cases, observing that early Supreme Court cases were reluctant to impute fraud. Tsurukawa I, 258 B.R. at 196 (discussing Neal v. Clark, 95 U.S. 704, 704 (1877)). In the Clark decision, the Supreme Court interpreted bankruptcy law excepting debts for fraud as targeting a debtor's actual or positive fraud, not fraud implied in law. Clark, 95 U.S. at 709. Because the debtor did not directly cause the fraud, he was entitled to a discharge of that debt. Id.

However, in Strang v. Bradner, 114 U.S. 555 (1885), the Supreme Court imputed fraud committed by one partner to other partners. Id. at 560-561. In Strang, the debtors and the wrongdoer were partners. The Supreme Court held that because there was a partnership relationship with the debtors, and because

-14-

the wrongdoing involved a partnership transaction, the wrongdoing of a partner was properly imputed to the partners, that is, the debtors.

Relying on Strang, various courts have imputed the fraudulent conduct of one partner to another in bankruptcy situations. In BancBoston Mortg. Corp. v. Ledford (In re Ledford), 970 F.2d 1556 (6th Cir. 1992), the court, citing Strang, held that the wrongful acts of a partner were imputed to an innocent partner for purposes of § 523(a)(2)(A) when (1) the debtor was a partner, (2) the debtor's partner committed fraud while acting on behalf of the partnership in the ordinary course of business, and (3) the debtor/partner reaped the monetary benefits of the unlawful conduct. Id. at 1561.

The Fifth Circuit reached a similar conclusion in Luce v. First Equip. Leasing Corp. (In re Luce), 960 F.2d 1277 (5th Cir. 1992)(per curiam). In Luce, the court held that a debtor is liable for a debt incurred by the deception of his spouse/partner if the debtor benefited monetarily from such deception. Id. at 1283. Indeed, the court viewed "the imputation issue as one about business partners" and stated that "the concepts of law we employ do not turn on the nature of the marital relationship, but on the nature of the business relationship between the [business partners]." Id. at 1284 n.10. But also see Allison v. Roberts (In re Allison), 960 F.2d 481 (5th Cir. 1995), where the Fifth Circuit refused to impute fraud to an innocent spouse where there was "no basis for applying the agency fraud theory." Id. at 486.

Importantly, the Ninth Circuit, in La Trattoria, Inc. v. Lansford (In re Lansford), 822 F.2d 902 (9th Cir. 1987), in dicta

-15-

has stated that if it were "to rely on strict agency or partnership principles," it might have been forced to conclude that a spouse who was not directly liable for fraud was liable for her husband's fraud. Id. at 904-05.

The year after Tsurukawa I was decided, the Panel decided Tsurukawa II.[4] In its opinion, the Panel expressly adopted the rule that fraud may be imputed to a spouse under partnership/ agency principles in a § 523(a)(2)(A) action. The Panel's ruling has since been accepted both within and outside the Ninth Circuit. Hawkins v. Franchise Tax Bd. (In re Hawkins), 430 B.R. 225, 239 n.25 (Bankr. N.D. Cal. 2010) (citing Tsurukawa II for the proposition that, "One spouse can be vicariously liable for bad acts of the other spouse committed in furtherance of a business partnership including both spouses."), aff'd 447 B.R. 191 (N.D. Cal. 2011); Stevens v. Antonious (In re Antonious), 358 B.R. 172, 185 (Bankr. E.D. Pa. 2006) (extensively quoting from Tsurukawa II in adopting the rule); In re Banke, 275 B.R. 317, 329 (Bankr. N.D.

---

[4] Tsurukawa I and II arose from the same bankruptcy case. In Tsurukawa I, the bankruptcy court ruled that the debtor was liable to creditor based on her knowing participation in, and benefit from, the fraudulent business of her husband, but declining to find either fraudulent intent or that she and her husband were partners in the fraudulent business. On appeal, the Panel reversed and remanded "for a determination as to whether (1) an agency relationship existed between Debtor and [her husband] or (2) Debtor had the requisite fraudulent intent to deceive[.] Tsurukawa I, 258 B.R. at 197. On remand, the bankruptcy court concluded that debtor and spouse "were business partners, inferring their intent to create such a relationship from their acts" and "found the existence of a principal-agent relationship." Tsurukawa II at 520. The Tsurukawa II panel affirmed. Tsurukawa II, 287 B.R. at 521. The Panel agreed with the bankruptcy court that the debtor "performed substantial activities for the business . . . and assumed an active role in [the company] that goes beyond merely holding a community property interest in her husband's business and performing minor services for that business." Id. at 522-23.

-16-

Iowa 2002) ("If a husband and wife are partners in a business, separate from the marital relationship, both may be held responsible for the fraudulent acts of one of them.").

The teachings of Tsurukawa II can be summarized in three principles:

First, marriage alone is not sufficient to impute fraud from one spouse to another. A business partnership between a debtor and spouse for denial of discharge purposes exists where "the debtor assumed an active role in the [spouse's business] that goes beyond merely holding a community property interest in [the spouse's] business and performing minor services in that business." Tsurukawa II, 287 B.R. at 521.

Second, "fraud may be imputed to a spouse under agency/partnership principles in a § 523(a)(2)(A) action." Id. at 525. Whether an agency or partnership sufficient to justify imputation of fraud to a spouse exists is a question to fact to be decided under state law. California law applies in this case. A California partnership is "an association of two or more persons to carry on as co-owners a business for profit." CAL. CORP. CODE § 16101(7) (2013). Whether parties have entered into a partnership relationship, rather than some other form of relationship, is a question of fact "to be determined by the trier of fact from the evidence and inferences to be drawn therefrom" and depends on whether they intended to share in the profits, losses and the management and control of the enterprise. See Bank of Cal. v. Connolly, 36 Cal. App. 3d 350, 364 (Cal. Ct. App. 1973); Nelson v. Abraham, 177 P.2d 931, 933 (Cal. 1947). Property co-ownership of any sort, as well as profit-sharing, are factors

-17-

which tend to establish partnership. But see Holmes v. Lerner, 88 Cal. Rptr. 2d 130, 138 (Cal. Ct. App. 1999) (holding that sharing of profits is one evidence of partnership, but not a required element).

Each partner is an agent of the partnership for the purpose of its business. CAL. CORP. CODE 16301(a) (2013). Each partner acts as principal for himself or herself and as agent for the copartners in the transaction of partnership business. Tufts v. Mann, 2 P.2d 500, 503 (Cal. 1931). In addition, "a general partner's liability is the same as that of a principal for the fraud of his agent while acting within the scope of his authority." Pearson v. Norton, 230 Cal. App. 2d 1, 14-15 (Cal. Ct. App. 1964) (finding partner-wife liable for partner-husband's fraud in sale of partnership property).

Third, it is not necessary to prove "any knowledge on the 'innocent' debtor's part of the fraudulent conduct" for imputed liability purposes. Id. at 525. Of course, if the debtor participated directly in the spouse's fraud, that could be grounds for finding direct liability rather than imputed liability. Id. at 527.

In this case, evidence was presented which the bankruptcy court could review in determining the existence of an agency or partnership between Debtors sufficient to impute liability for the fraudulent actions of Mr. Shart to Ms. Schardt. For example, the evidence showed that: (1) Ms. Schardt may have prepared and mailed allegedly fraudulent accounting statements to Ms. Haig (testimony of John Sharp, an assistant to Ms. Haig and former vice president/general manager with Hilton International);

(2) Ms. Schardt may have maintained one bank account and check register for Mr. Shart's business and assisted in preparation of tax returns (testimony of Ms. Schardt); (3) Ms. Schardt may have made handwritten notes on billing disputes with Creditors and forwarded them to Mr. Shart (testimony of Ms. Schardt); (4) Ms. Schardt may have reviewed and edited Mr. Shart's responses to the billing disputes (testimony of Ms. Schardt); (5) Ms. Schardt may have directed her bookkeeper to ignore Ms. Haig's complaints about her bills (testimony of Ms. Schardt); (6) Ms. Schardt may have provided advice to Mr. Shart in his negotiations with Ms. Haig (deposition of Ms. Haig); (7) Ms. Schardt may have prepared some of the bills sent to Ms. Haig (deposition of John Sharp); (8) Ms. Schardt signed letters on Greystone letterhead relating to Greystone business matters.[5]

---

[5] At the argument before the Panel, Ms. Schardt suggested that some of her communications on behalf of her husband may have been undertaken in her role as his attorney. We have carefully examined the record before the bankruptcy court and find no instance where either Ms. Schardt or Mr. Shart asserted such argument to the bankruptcy court. Barring "exceptional circumstances," we will not review on appeal an issue not raised in the bankruptcy court. Smith v. Arthur Anderson LLP, 421 F.3d 989, 1000 (9th Cir. 2005).

Moreover, we note that, in the bankruptcy court, Ms. Schardt frequently denied that she had anything to do with her husband's business. When asked by counsel at trial whether she had given him legal advice, she testified "not ever":

Q: And even though you're an attorney and you already suspected litigation was likely, you didn't feel any need to counsel your husband in terms of how — what he should say in [the letter of December 26].

SCHARDT: You didn't know my husband. I don't counsel my husband what he says.

(continued...)

-19-

All of the points noted above were referenced in testimony and other evidence at trial. Of course, evaluating the weight to be assigned to such evidence is the province of the bankruptcy court. See Groves v. Pickett, 420 F.2d 1119, 1126 (9th Cir. 1970) ("Invading the extremely delicate area of passing on the credibility of witnesses is not our function."). Perhaps, in this case, the bankruptcy court considered these points and discounted them. But on this record, we simply cannot know.

Findings must be made and sufficiently explicit to provide the appellate court with an understanding of the basis of the trial court's decision and the grounds upon which the trial court reached that decision. Keane v. Comm'r of Internal Revenue, 865 F.2d 1088, 1091 (9th Cir. 1989). If the findings are so conclusory or incomplete that the appellate court is unable to review them "in the light of the evidence in the record and applicable legal principles," the appellate court must remand to the trial court to make the missing findings. Sumner v. San Diego Urban League, Inc., 681 F.2d 1140, 1142 (9th Cir. 1982).

While the bankruptcy court's oral comments at the conclusion of the trial adequately evidence its finding that Ms. Schardt did not engage in direct, active fraud, they do not sufficiently address whether a partnership or agency relationship may have existed between the spouses here so as to justify imputation of

---

[5](...continued)
Q: All right.

SCHARDT: Not ever.

Trial Tr. 100:23-101:4, May 3, 2012.

-20-

liability for the fraud of Mr. Shart to her. We are therefore left with one option: we must VACATE that portion of the judgment that determined that Ms. Schardt's debts to Creditors were discharged and REMAND this action to the bankruptcy court for consideration of, and the entry of, fact findings whether she was involved in a partnership or agency relationship with Mr. Shart such that his fraudulent behavior should be imputed to Ms. Schardt for the purposes of exception to discharge under § 523(a)(2)(A) as set forth in Tsurukawa I and Tsurukawa II.

**CONCLUSION**

We AFFIRM that portion of the bankruptcy court's decision concluding that Ms. Schardt did not directly engage in any fraudulent conduct. However, because Mr. Shart's fraud may be imputed to her, we VACATE that portion of the judgment relating to Ms. Schardt and REMAND this action to the bankruptcy court for further proceedings consistent with this decision.